EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Juan M. Frontera Suau, en su capacidad de Comisionado Electoral de Proyecto Dignidad, Proyecto Dignidad<br><br>Peticionario<br><br>v.<br><br>Jessika Padilla Rivera, en su capacidad oficial como Presidente Interino de la Comisión Estatal de Elecciones (CEE); Aníbal Vega Borges, en su capacidad oficial como Comisionado Electoral de Partido Nuevo Progresista; Karla M. Angleró González, en su capacidad oficial como Comisionada Electoral del Partido Popular Democrático; Lillian M. Aponte Dones, en su capacidad oficial como Comisionada Electoral del Movimiento Victoria Ciudadana; Roberto Iván Aponte Berríos, en su capacidad oficial como Comisionado Electoral del Partido Independentista Puertorriqueño; Estado Libre Asociado de Puerto Rico a través de la Secretaria de Justicia Janet Parra Mercado en su carácter oficial<br><br>Recurridos | Certiorari<br><br>2025 TSPR 54<br><br>215 DPR ___ |

Número del Caso:  CC-2025-0094


Fecha:  16 de mayo de 2025


Tribunal de Apelaciones:

    Panel IV

Representante legal de la parte peticionaria:

    Lcdo. Jaime L. Sanabria Montañez


Representantes legales de los recurridos:

Comisión Estatal de Elecciones

    Lcdo. Félix R. Passalacqua Rivera
    Lcda. Valeria Belvis Aquino
    Lcda. Vickmary Sepúlveda Santiago

Comisionado Electoral del Partido Nuevo Progresista

    Lcdo. Javier Quiñones Rosado
    Lcdo. Rafael F. Robert Sánchez
    Lcdo. Luis I. Quiñones Rosado

Comisionado Electoral del Partido Popular Democrático

    Lcdo. Luis Armando Vega Berríos
    Lcdo. Ernesto G. González Rodríguez

Oficina del Procurador General:

    Hon. Omar Andino Figueroa
    Procurador General

    Lcda. Mariola Abreu Acevedo
    Procuradora General Auxiliar


Materia: Derecho Constitucional y Derecho Electoral – Constitucionalidad de los artículos 3.1 (2) (a) - (f) y 6.1 del Código Electoral de Puerto Rico de 2020.


Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Juan M. Frontera Suau, en su capacidad de Comisionado Electoral de Proyecto Dignidad, Proyecto Dignidad<br><br>Peticionario<br><br>v.<br><br>Jessika Padilla Rivera, en su capacidad oficial como Presidente Interino de la Comisión Estatal de Elecciones (CEE); Aníbal Vega Borges, en su capacidad oficial como Comisionado Electoral de Partido Nuevo Progresista; Karla M. Angleró González, en su capacidad oficial como Comisionada Electoral del Partido Popular Democrático; Lillian M. Aponte Dones, en su capacidad oficial como Comisionada Electoral del Movimiento Victoria Ciudadana; Roberto Iván Aponte Berríos, en su capacidad oficial como Comisionado Electoral del Partido Independentista Puertorriqueño; Estado Libre Asociado de Puerto Rico a través de la Secretaria de Justicia Janet Parra Mercado en su carácter oficial<br><br>Recurridos | CC-2025-0094 | Certiorari |

Opinión del Tribunal emitida por el Juez Asociado señor Kolthoff Caraballo

En San Juan, Puerto Rico, a 16 de mayo de 2025.

Hace varios meses este Tribunal atendió una controversia que incidió en la carrera electoral de ciertos aspirantes en miras a la celebración de las Elecciones Generales de 2024.[1] En esa ocasión, nos encontrábamos con aspirantes primaristas que, para

---

[1] *Rivera Segarra v. Rivera Lassén*, 213 DPR ___, 2024 TSPR 60 (2024).

estar en igualdad de condiciones, procuraban que los aspirantes de una colectividad que escogieron el método alterno de selección de candidatos cumplieran con los requisitos de la ley y reglamentos sobre el recogido de endosos. Allí, de entrada, expresamos que **"Justicia es aplicar la ley de la misma forma a todos aquellos que se encuentren en las mismas circunstancias"**.[2] Esas circunstancias de igualdad exigidas estaban dirigidas para cualificar para una de las carreras de mayor trascendencia: las Elecciones Generales.

En esta ocasión, es el Sr. Juan M. Frontera Suau, en su capacidad de Comisionado Electoral de Proyecto Dignidad (PD), quien no alcanzó la certificación y, como resultado de ello, nos plantea que "la carrera es injusta". En específico, aduce que el esquema operacional dispuesto en el Código Electoral de 2020, *infra*, en sus Arts. 3.1(2)(a)-(f) y 6.1 son inconstitucionales porque, según él, promueven el trato desigual entre los Partidos Políticos con franquicia electoral. No le asiste la razón. Veamos.

## I

Expedimos el presente caso para atender únicamente el asunto de la constitucionalidad de los Arts. 3.1(2)(a)-(f) y 6.1 del Código Electoral de Puerto Rico de 2020, Ley Núm. 58-2020, según enmendada, 16 LPRA secs. 4511(2)(a)-(f) y 4591 (Código Electoral de 2020). No obstante, a modo de presentar un marco más completo, expondremos un recuento fáctico que abarque ambos errores atendidos en los foros *a quo*.

El 27 de diciembre de 2024, la Comisión Estatal de Elecciones (CEE) a través de su Presidenta Alterna, la Hon. Jessika Padilla Rivera, le notificó mediante carta al Comisionado Electoral

---

[2] *Íd.*, pág. 1. Negrilla en el original.

de Proyecto Dignidad, el Sr. Juan M. Frontera Suau (señor Frontera Suau o Peticionario), que efectivo el 13 de enero de 2025, se procedería al cierre operacional de la oficina del Comisionado de Proyecto Dignidad. Así, se destituirían 14 empleados del partido: en específico, 9 empleados que estaban adscritos a las Juntas de Inscripción Permanente (JIP), 3 empleados adscritos a su oficina, y 2 empleadas adscritas a la Junta del Voto Ausente y Adelantado.

En oposición, el 30 de diciembre de 2024, el Peticionario presentó una Demanda jurada de sentencia declaratoria, interdicto preliminar y permanente, y solicitud de injunction preliminar ante el Tribunal de Primera Instancia de San Juan (TPI o foro de primera instancia). Allí, arguyó que el Código Electoral de 2020, *supra*, dispone en su Artículo 3.10(1) que el término de vigencia para los nombramientos de los Comisionados Electorales de los partidos políticos con franquicia electoral se extiende hasta el 30 de junio del año siguiente a cada Elección General, en este caso, hasta el 30 de junio de 2025.

Por otra parte, el señor Frontera Suau añadió que el foro de primera instancia, por virtud de su Sentencia en el caso *Aponte Berríos, et al. v. C.E.E.*, Civil Núm. SJ2021CV00163 consolidado con el SJ2021CV00211 y con el SJ2021CV00296, le reconoció a Proyecto Dignidad una participación igualitaria ante el pleno de la CEE. Lo anterior se tradujo en que, durante el cuatrienio de 2020-2024, PD tuviera derecho a una oficina, con los empleados y los puestos requeridos, así como eventualmente representantes en las JIP y en la JAVAA.

Finalmente, el Peticionario señaló que el esquema operacional dispuesto en el Código Electoral de 2020, *supra*, en los Artículos 3.1(2) (a)-(f) y Artículo 6.1, priva a Proyecto

Dignidad y a sus electores, como un partido con franquicia electoral, de la representación igualitaria ante la CEE, esto, según lo dispuesto en la Constitución de Puerto Rico y al amparo de lo resuelto en el caso *P.R.P. v. E.L.A.*, 115 DPR 631 (1984).

Luego de varios trámites procesales, el TPI notificó una *Sentencia* en la que sostuvo que la determinación de la Presidenta Alterna de la CEE fue prematura, toda vez que el Art. 3.10(2) del Código Electoral de 2020, *supra*, establece que la designación del Comisionado Electoral propietario o adicional en la CEE expirará 10 días después de que se certifiquen los resultados finales del Escrutinio General. **En cuanto al argumento constitucional, el foro de primera instancia se limitó a destacar que, de acuerdo con la doctrina de autolimitación judicial, no lo consideraría por estar en posición de resolver el asunto mediante un análisis estatutario.**

En desacuerdo con la determinación del Tribunal de Primera Instancia, el señor Frontera Suau recurrió ante el Tribunal de Apelaciones y presentó los mismos errores que se atienden en este recurso. Entiéndase, que el foro de primera instancia erró al aplicar las disposiciones del Artículo 3.10(2) del Código Electoral de 2020, *supra*, toda vez que Proyecto Dignidad retuvo su franquicia electoral durante las elecciones generales de 2024. **Añadió que incidió el foro primario al negarse a atender la controversia constitucional ante su consideración basándose en una aplicación errónea de la doctrina de autolimitación judicial.**

Así las cosas, el foro apelativo intermedio notificó una *Sentencia* en la que confirmó al Tribunal de Primera Instancia. En síntesis, al igual que el foro de primera instancia, concluyó que era meritorio aplicar el Artículo 3.10(2) del Código Electoral de 2020, *supra*, a la presente controversia. En vista de ello,

determinó que fue prematuro el aviso emitido por la Presidenta Alterna de la CEE. **Referente al aspecto constitucional, el Tribunal de Apelaciones fundamentó que no era necesario considerarlo, por entender que las controversias eran susceptibles de resolverse mediante un análisis estatutario del Código Electoral de 2020,** *supra*, **y las disposiciones relacionadas a los partidos políticos y sus respectivos comisionados electorales.**

Inconforme, el señor Frontera Suau compareció ante este Tribunal a través de una *Moción urgente en auxilio de la jurisdicción* y un *Recurso de Certiorari*. A grandes rasgos, reiteró los señalamientos de error levantados ante el Tribunal de Apelaciones, a saber: (1) que el término del Comisionado Electoral de Proyecto Dignidad culminaba el 30 de junio de 2025; y (2) que el esquema operacional dispuesto en el Código Electoral de 2020, *supra*, en sus artículos 3.1(2) (a)-(f) y artículo 6.1 es inconstitucional.

Evaluados los méritos, emitimos una *Resolución* mediante la cual resolvimos expedir el recurso conforme a la Regla 50 de este Tribunal, 4 LPRA Ap. XXI-B y le ordenamos a las partes a que se expresaran únicamente en lo concerniente a la constitucionalidad de los Arts. 3.1(2)(a)-(f) y 6.1 del Código Electoral de 2020, *supra*. Presentados los alegatos, nos encontramos en posición de resolver, no sin antes discutir el marco legal correspondiente.

**II**

**A. Situación económica de Puerto Rico y la Junta de Supervisión y Administración Financiera para Puerto Rico**

Como resultado de una crisis en las finanzas del Gobierno de Puerto Rico ante la incapacidad de cumplir con el pago de una deuda millonaria, el 30 de junio de 2016, entró en vigor la Ley de

Supervisión, Administración, y Estabilidad Económica de Puerto Rico ("Puerto Rico Oversight, Management, and Economic Stability Act") o "PROMESA" por sus siglas en inglés, 48 USCA sec. 2101. Esta es una ley federal promulgada por el Congreso de los Estados Unidos por virtud de la Cláusula Territorial de la Constitución de los Estados Unidos, enmarcada en su Artículo IV, Sección 3, de la Constitución de los Estados Unidos.[3]

La Ley PROMESA estableció la Junta de Supervisión y Administración Financiera para Puerto Rico (Junta) como una entidad, al igual que estructuró la organización de dicho cuerpo. Así, las disposiciones incluidas en la ley van dirigidas a la concesión de poderes y facultades a la Junta para cumplir los objetivos presentados en la ley.

De entrada, el propósito de la Junta es proveer un método para lograr que el territorio alcance la responsabilidad fiscal y el acceso a los mercados capitales.[4] Asimismo, **la ley establece expresamente que los preceptos de la Ley PROMESA prevalecerán sobre cualquier disposición general o específica de las leyes locales o cualquier otra reglamentación que sea incompatible con la ley**.[5]

El Titulo II de la Ley PROMESA establece los deberes de la Junta y se divide en 12 secciones. Entre los deberes conferidos a la Junta por virtud de la Ley, específicamente, la sección 205(a) establece el deber de presentar recomendaciones al territorio sobre la estabilidad financiera y la responsabilidad administrativa.[6]

---

[3] "PROMESA" Puerto Rico Oversight, Management, and Economic Stability Act, SITUM, Inc., 2017, pág. 13.

[4] Sec. 101 de la Ley PROMESA, 48 USCA sec. 2121.

[5] Sec. 4 de la Ley PROMESA, 48 USCA sec. 2103.

[6] La Sección 205(a) de la Ley PROMESA, 48 USCA sec. 2145, establece el deber de presentar recomendaciones al territorio sobre la estabilidad financiera y la responsabilidad administrativa al disponer lo siguiente:

Conforme a lo establecido en la sección 205 (a) de la ley, el 21 de enero de 2018, **la Junta envió una comunicación al Gobernador de Puerto Rico, al Presidente del Senado y al Presidente de la Cámara de Representantes mediante la cual recomendó que la Comisión Estatal de Elecciones debía ajustar su operación administrativa y reestructurar su organización para ser más eficiente.** En lo pertinente, la misiva indicaba lo siguiente:

> […] we write to recommend that the Puerto Rico State Elections Commission (the "CEE" in Spanish) adjust its operations to fluctuate with the electoral cycle and restructure its organization to become more efficient.
>
> The CEE does essential work to bolster democracy by registering voters and managing the electoral process. While this work, could not be more important, it is nonetheless the case that the Oversight Board Believes the CEE's current operations do not match the needs that it serves or the fiscal reality of the Island. Elections take place every four years. **The CEE should be most active in the year leading up to an election but can and should significantly reduce its operations in the remaining three years of an electoral cycle.** This is what comparable electoral commissions do in most states.
>
> .    .    .    .    .    .
>
> The Oversight Board is cognizant of recent public expressions that are aligned with this recommendation, and welcomes legislation and administrative action to transform the CEE´s current operations […].[7]

---

(a) EN GENERAL. — La Junta de Supervisión, en cualquier momento, podrá presentar recomendaciones al Gobernador o la Legislatura sobre las acciones que el gobierno del territorio puede tomar para garantizar el cumplimiento con el Plan Fiscal, o para que de otro modo promueva la estabilidad financiera, el crecimiento económico, la responsabilidad administrativa y la eficiencia en la forma en que el gobierno del territorio presta sus servicios, incluyendo recomendaciones concernientes a--

(1) el manejo de los asuntos financieros del gobierno del territorio, incluyendo la capacidad para hacer proyecciones económicas y fiscales plurianuales, la tecnología de la información, controlar los gastos del personal, reducir los costos de los beneficios, reformar las prácticas de adquisición y colocar otros controles sobre los gastos;
(2) la relación estructural de los departamentos, agencias y agencias independientes dentro del gobierno del territorio;
(3) la modificación de las estructuras de ingresos existentes o la creación de estructuras de ingresos adicionales; […]

[7] Surge del Sistema Unificado de Manejo y Administración de Casos del Poder judicial que el 30 de diciembre de 2024, la parte recurrida (el Lcdo. Aníbal Vega Borges, en su Capacidad Oficial como Comisionado Electoral del Partido Nuevo Progresista) presentó en *Juan M. Frontera Suau y Otros v. Jessika D. Padilla Rivera y Otros*, Caso Núm. SJ2024CV11796 una *Solicitud de desestimación* en la cual adjuntó al expediente electrónico la carta a la cual hacemos referencia.

Tras varios trámites y comunicaciones,[8] conforme a la Sección 201(b)(1) de la Ley PROMESA,[9] el 27 de mayo de 2020, la Junta presentó el Plan Fiscal para implementar en Puerto Rico.[10] El Capítulo 13 del Plan Fiscal discutió una reforma sobre la eficiencia y las mejoras operacionales de las agencias gubernamentales. Específicamente, la Sección 13.11 mencionó la CEE, entre otras agencias y puntualizó que:

> **The State Elections Commission (SEC or "CEE" by its Spanish acronym) is charged with administering elections for the Commonwealth. Given this important role, every effort must be made to ensure that SEC can thoroughly execute its mandate to promote and enable voter rights for the people of Puerto Rico in the most efficient, simplest, and least costly ways.** The Oversight Board is deeply committed to supporting elections that are conducted in a fair, free, and open manner. Consistent with this objective, **the Oversight Board also holds the SEC must adapt its processes to bring down the Island's cost of election administration closer to that of mainland states.**
>
> While SEC's operations are currently governed by Act 78-2011, which requires electoral balance and minimum staffing requirements across its programs (e.g., General administration, Permanent Registration Boards, Planning & Development of Electoral Activities, and Election Commissioners), the Oversight Board's analysis of SEC's staffing indicates that more than half of its current 650+ staff are employed in roles that are not legally required within the agency. Further, the lack of modernization in the electoral services offered by SEC (e.g., no automatic or digital voter registration channels, no provisions for vote-by-mail, requirement of a separate voter ID card) further exacerbates operational and fiscal inefficiencies.

---

[8] Cabe resaltar que, el 20 de febrero de 2019, el Presidente de la Comisión Estatal de Elecciones (CEE) y los Comisionados Electorales enviaron una comunicación al Gobernador de Puerto Rico, al Presidente del Senado y al Presidente de la Cámara de Representantes y entre otros asuntos discutidos, antes de esbozar las actividades presentadas en el calendario electoral, coincidieron con el principio de que, en tiempos de estrechez económica se debe procurar que todas las entidades gubernamentales operen con la mayor eficiencia y hagan uso más prudente de los recursos sin que las intenciones de generar ahorros resulten en un menoscabo de las funciones públicas. https://www.cee.pur.org/prensa/Cmu20190221-CEERespondePeticionJSF.htm (última visita 28 de abril de 2025).

[9] Sec. 201 (b)(1) de la Ley PROMESA, 48 USCA sec. 2141, establece que el "plan fiscal desarrollado bajo esta Sección proveerá, con respecto al gobierno del territorio o a la instrumentalidad territorial cubierta, un método para lograr la responsabilidad fiscal y el acceso a los mercados de capital". (traducción nuestra).

[10] https://docs.pr.gov/files/AAFAF/Financial_Documents/Fiscal%20Plans/CERTIFIED %20FISCAL%20PLANS/Fiscal-Plan-for-Commonwealth-of-Puerto-Rico_Certified-asof-May-27-2020.pdf (última visita 28 de abril de 2025).

> **The 2020 Fiscal Plan continues to expect the SEC to reduce its steady state (non-election year) expenditures, based on FY2018, by 32% by FY2022.**
>
> . . . . . . . .
>
> **In January 2019, the Oversight Board asked the Governor and Legislature to adjust the operations of the SEC to fluctuate with the electoral cycle and restructure its organization to become more efficient. In April 2019, the Governor responded by agreeing that the SEC's operations must be restructured but declining to adopt the Oversight Board's request. […]**

Este Tribunal ha reconocido la posibilidad de que, en circunstancias de emergencias relacionadas con aspectos económicos, la Asamblea Legislativa puede hacer uso de sus amplios poderes. De hecho, anteriormente tomamos conocimiento judicial sobre "la precaria situación económica del país", y de la manera en la que se refleja al producir una "grave crisis" en las finanzas del Gobierno.[11]

De la misma forma, en este caso, **en respuesta a la crisis económica que provocó los trámites esbozados y los requerimientos de la Junta, el 20 de junio de 2020, entró en vigor el Código Electoral de 2020,** *supra,* **para implementar una legislación que, entre otras cosas, tiene el propósito de economizar recursos y modernizar los servicios de la CEE.**

La Exposición de Motivos del Código Electoral de 2020, *supra,* dispone que la ley "garantiza la continuidad operacional de la CEE adoptando nuevas condiciones para modernizar a esta agencia, **hacerla menos costosa** y más eficiente sin sacrificar el derecho del pueblo soberano a ser convocado en cualquier momento para ejercer su derecho al voto cuando fuese necesario, según se desprende de nuestra Constitución".[12]

---

[11] *Domínguez Castro et al. v. E.L.A. I*, 178 DPR 1 (2010).

[12] Exposición de Motivos de la Ley Núm. 58-2020, 16 LPRA sec. 4501 *et seq.*, conocida como el Código Electoral de Puerto Rico de 2020 (Código Electoral de 2020).

De esta forma, **la introducción del andamiaje establecido en el Código Electoral de 2020,** *supra,* **refleja el esfuerzo de reorganizar la CEE al amparo del criterio de eficiencia y economía de recursos con la eliminación de gastos innecesarios que buscan optimizar los recursos públicos.**

Expuesto lo anterior, procederemos a evaluar la composición actual de la CEE, conforme al mandato de la Junta. En dicha evaluación, impera recordar que el criterio rector de dichos cambios fue garantizar la participación de todos los partidos y, al mismo tiempo, **reducir los costos operacionales.** Un enfoque que va a la médula de los requerimientos y estándares implementados por la Junta.

## B. El Código Electoral de 2020

A la Legislatura se le ha conferido por mandato constitucional la facultad de promulgar "todo lo concerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidaturas".[13] Por ello, "los partidos políticos, las candidaturas de los aspirantes a puestos políticos y los derechos de los electores están obligados por la legislación que, a esos efectos, promulgue la Asamblea Legislativa".[14] En atención a dicha autoridad delegada, la Legislatura aprobó el Código Electoral de 2020, *supra*.

Según mencionamos, el Código Electoral de 2020, *supra*, promulga varios propósitos y, en lo pertinente a la controversia de autos, la Exposición de Motivos señala como uno de los principios fundamentales de la medida: el **"[m]odernizar y**

---

[13] Sec. 4 del Art. VI, Const. PR, LPRA, Tomo 1, ed. 2016, pág. 283.

[14] *Rivera Segarra v. Rivera Lassén*, supra.

**reestructurar la [CEE] para que sea una entidad pública más accesible, eficiente y menos costosa para los contribuyentes"**.[15] La esencia de este principio general se recoge en el Art. 3.1(5)(a) del Código Electoral de 2020, *supra*, que atiende la estructura institucional de la CEE, al disponer que esta es "una institución de operación continua, compacta al máximo posible en sus recursos humanos, oficinas y dependencias, sin sacrificar la eficiencia y la pureza de los servicios, procesos y eventos electorales". El otro principio fundamental que atiende la Exposición de Motivos es "[p]roveer a los partidos políticos y a los candidatos un marco legal que garantice sus derechos federales y estatales en razonable balance con los derechos individuales de los electores".[16]

El legislador era consciente de las limitaciones y de la necesidad de realizar ajustes presupuestarios en beneficio de los contribuyentes y, responsablemente, garantizarle a los partidos políticos y a sus componentes los derechos que les cobijan sin afectar los derechos de los electores. Para lograrlo, entre otros asuntos, el Código Electoral de 2020, *supra,* estableció un marco normativo detallado para la clasificación y representación de los partidos políticos en Puerto Rico, el cual regula tanto su certificación, como su participación en la CEE. En particular, la relación de los Arts. 6.1 y 3.1(2) del Código Electoral de 2020, *supra* (16 LPRA secs. 4511 y 4591) que delimitan los requisitos de certificación y clasificación de los partidos políticos y establece la estructura de la representación de estos en la CEE.

---

[15] Exposición de Motivos del Código Electoral de 2020. Negrilla Suplida.

[16] *Íd*. Negrilla Suplida.

## C. Relación de la clasificación de partidos políticos con la composición ordinaria y excepcional de la CEE.

El Art. 6.1 del Código Electoral de 2020, *supra,* regula lo concerniente a los partidos políticos en Puerto Rico. La disposición legal define que "un Partido Político de Puerto Rico es aquel con franquicia electoral y así certificado por la Comisión, siempre que cumpla con todos los requisitos dispuestos en este Artículo según sus respectivas categorías".[17] Además, la legislación reconoce que los partidos son entidades privadas que poseen un amplio interés público y reconocimiento constitucional. Ello se debe a que promueven la participación ciudadana a través del voto, libre, secreto y directo únicamente de las personas naturales que pueden formar o afiliarse a partidos políticos.

Señala este precepto que, una vez certificados, los partidos políticos quedan obligados a cumplir con la legislación y sus reglamentos.[18] Igualmente, los partidos políticos solo se reconocerán individualmente dentro de las categorías que se establecieron, por lo que expresamente prohibió las alianzas o coligaciones entre partidos, sus candidatos o candidatos independientes. Finalmente, si un partido político pierde la franquicia electoral en una Elección General, este deberá completar nuevamente el proceso de certificación para recuperarla. Entonces, en lo pertinente a la controversia que nos ocupa, "[t]odo Partido Político o agrupación de ciudadanos se certificará, conforme a su cumplimiento con los siguientes requisitos:

    (1) *Partidos Estatales*

---

[17] El Art. 2.3(85) del Código Electoral de 2020, (16 LPRA sec. 4503) dispone que los partidos políticos de Puerto Rico se encuentran definidos en el Art. 6.1 del Código Electoral de 2020, (16 LPRA sec. 4591).

[18] *Rivera Segarra v. Rivera Lassen*, *supra*.

(a) **'Partido Estatal'** – Partido Político con franquicia electoral que, en la más reciente Elección General, participó y cumplió con los siguientes requisitos:

    i.   Como mínimo, postuló bajo su insignia las siguientes candidaturas:

    ii.

      (A) Papeleta Estatal: un candidato a Gobernador de Puerto Rico y un candidato a Comisionado Residente de Puerto Rico en Washington D.C.

      (B) Papeleta Legislativa: un candidato a senador por acumulación; un candidato a representante por acumulación.

      (C) Papeleta Municipal: un candidato a alcalde con las candidaturas agrupadas de sus Legisladores Municipales, en por lo menos el cincuenta por ciento (50%) de los municipios de Puerto Rico.

ii. Obtuvo más del dos por ciento (2%), pero menos del veinticinco por ciento (25%) de los votos íntegros bajo su insignia en la Papeleta Estatal del total de votos válidos emitidos en esa papeleta.

(b) **'Partido Estatal por Petición'**– Agrupación de ciudadanos que, antes de la próxima Elección General, solicita y cumplió con [todos los requisitos de inscripción y certificación] […][19]

viii. Luego de la Elección General para la que peticionó su certificación, solamente retendrá su franquicia electoral como Partido Estatal aquel que haya obtenido más de dos por ciento (2%) de votos íntegros del total de votos válidos adjudicados en la papeleta Estatal.

(c) **'Partido Estatal de Mayoría'**– 'Partido Estatal Principal' con franquicia electoral que, en la más reciente Elección General, obtuvo la mayor cantidad de votos íntegros bajo su insignia en la Papeleta Estatal del total de votos válidos emitidos en esta papeleta.

(d) **'Partido Estatal Principal'** – 'Partido Estatal' con franquicia electoral que, en la más

---

[19] Para fines de la discusión en la *Opinión* y evitar confusiones, nos referiremos a los Partido(s) Estatal(es) por Petición como Partido(s) por Petición. Destacamos que, en esencia, el Partido por Petición, es un partido emergente y que para permanecer en el ruedo, la CEE tienen la obligación de expedir una certificación preliminar sobre el cumplimiento de los requisitos exigidos para esta clasificación. Si el Partido por Petición incumple con los requisitos del Art. 6.1(b), el Art. 3.10(2) del Código Electoral de 2020, *supra*, establece que el comisionado electoral cesará funciones inmediatamente. En caso de cumplir y la CEE certifique que en la reciente Elección General el Partido por Petición mantuvo la franquicia electoral con más del 2% de votos íntegros del total de votos válidos adjudicados en la Papeleta Estatal, oficialmente su categoría debe cambiar a Partido Estatal y se mantendría con el derecho a su comisionado electoral adicional. Art. 3.1(e) del Código Electoral de 2020, *supra*.

> reciente Elección General, obtuvo más del veinticinco por ciento (25%) de votos íntegros bajo su insignia en la Papeleta Estatal del total de votos válidos emitidos en esa papeleta. [20]
> […]".[21]

De los incisos que anteceden surge que el legislador, además de que estableció criterios de certificación, instituyó gradaciones o categorías de los partidos políticos, diferenciándolos según su desempeño electoral. El primer grado es el **Partido Estatal**, clasificación que, a su vez, es la punta de lanza concerniente a los requisitos mínimos que tienen que cumplir todas las categorías de los partidos políticos en el ámbito estatal. Esta clasificación posee la franquicia electoral porque en la última Elección General, como mínimo, postuló bajo su insignia: los 2 candidatos para la Papeleta Estatal, un senador y un representante ambos por acumulación en la Papeleta Legislativa y el 50% de los candidatos a las alcaldías y sus asambleístas en la Papeleta Municipal; y en los recientes comicios obtuvo **más del 2% pero menos del 25% de votos íntegros bajo su insignia en la Papeleta Estatal del total de votos válidos emitidos en esa papeleta.** (En adelante votos íntegros, válidos y elegibles).

Por otro lado, el **Partido Principal** es la segunda categoría pues es un Partido Estatal que **supera el 25% de los votos íntegros, válidos y elegibles.** Finalmente, el tercer rango es el **Partido de Mayoría** y este es un Partido Principal que **excedió el 25% y obtuvo la mayor cantidad de votos íntegros, válidos y elegibles** en el último evento electoral. Es decir, un **Partido de Mayoría es el Partido Principal con más apoyo electoral en la Papeleta Estatal**

---

[20] Para fines de la discusión en la *Opinión* y evitar confusiones, nos referiremos a los Partido(s) Estatal(es) Principal(es) como Partido(s) Principal(es).

[21] Negrilla en el original.

**en las recientes Elecciones Generales.** La similitud entre los Partidos Estatales, por Petición, Principales y de Mayoría es que todos son Partidos Estatales y se diferencian en el nivel de respaldo electoral obtenido en la última Elección General.

Lo esencial respecto al Art. 6.1(1) del Código Electoral de 2020, *supra,* es que el porcentaje de la franquicia electoral con relación a los votos íntegros, válidos y elegibles define la clasificación del partido político ante la CEE y, según lo perfila el Art. 3.1(2) del Código Electoral de 2020, *supra,* este determina si el comisionado electoral de la colectividad formará parte de la composición de la CEE como miembro propietario o adicional.

El Art. 3.1(2) del Código Electoral de 2020, *supra,* establece la composición de la CEE de la manera siguiente:

> (2) *Composición de la Comisión Estatal de Elecciones*
> (a) Como organismo colegiado, deliberativo y adjudicativo los miembros propietarios de la Comisión, con voz y voto serán un Presidente; un mínimo de dos (2) y hasta un máximo de tres (3) Comisionados Electorales propietarios en representación de cada Partido Estatal Principal con franquicia electoral después de la Elección General más reciente **y que obtuvieron la mayor cantidad de votos íntegros bajo su insignia en la Papeleta Estatal del total de votos válidos emitidos en esa Papeleta.**
>
> (b) Serán miembros *exofficio* de la Comisión, el Presidente Alterno, los Comisionados Alternos designados por cada Comisionado Electoral propietario y un Secretario. Estos funcionarios tendrán voz, pero sin voto; excepto cuando el Presidente delegue su representación a su Alterno y cuando algún Comisionado notifique al Presidente que su ausencia estará representada por su correspondiente Comisionado Alterno.[22]
>
> (c) Cuando luego de la Certificación final del Escrutinio General de los resultados de una Elección

---

[22] De acuerdo con el inciso (2)(b) del Art. 3.1 del Código Electoral de 2020 (16 LPRA sec. 4511) el Presidente Alterno y los comisionados alternos son miembros *ex oficio* de la CEE, con voz pero sin voto. Sin embargo, estos tendrán voz y voto por delegación expresa del Presidente de la CEE con relación al Presidente Alterno y cuando el miembro o comisionado propietario notifique al Presidente de la CEE que será representado por el designado comisionado electoral alterno. Los miembros alternativos entran en función por delegación y en sustitución del propietario.

General haya menos de tres (3) Partidos Estatales Principales con franquicia electoral, según definidos en el Artículo 6.1 de esta Ley, se procederá a aumentar la composición de la Comisión hasta completar el máximo de tres (3) Comisionados Electorales propietarios. Este mecanismo de adición se realizará, según fuese necesario, **con el Comisionado Electoral del Partido Estatal con franquicia electoral que obtuvo en la elección general más reciente la segunda, y hasta la tercera mayor cantidad de votos íntegros obtuvo bajo su insignia en la Papeleta Estatal del total de votos válidos emitidos en esa papeleta.** Este o estos Comisionados Electorales se reconocerán como miembros propietarios de la Comisión.

(d) Cuando luego de la Certificación final del Escrutinio General o Recuento de los resultados de una Elección General haya menos de tres (3) Partidos Estatales **Principales** y Partidos **Estatales con franquicia electoral elegibles para aumentar la composición de la Comisión mediante el mecanismo de adición** conforme al apartado (c) de este Artículo, entonces prevalecerá la composición mínima de dos (2) Comisionados Electorales propietarios en la Comisión con los dos (2) Partidos Estatales elegibles conforme a los requisitos de apoyo electoral y a las candidaturas postuladas según se dispone en el Artículo 3.1, inciso (2), apartado (a) de esta Ley.

. . . . . . . .

(f) Como medida transitoria, cualquier Partido Estatal por Petición cuyo Comisionado Electoral sea miembro propietario en la Comisión al momento de aprobarse esta Ley retendrá esa membresía bajo las mismas condiciones específicas dispuestas en el Artículo 3.10, inciso 9 hasta la Certificación Final por la Comisión de los resultados electorales del Escrutinio General de la Elección General de 2020; pero sin que el reconocimiento de esta retención específica y transitoria se interprete para limitar o impedir la implementación de las demás disposiciones de esta Ley, incluyendo el Balance Institucional.

(g) Cualquier situación de empate en los votos obtenidos por Partidos Políticos al determinarse la composición máxima de la Comisión, se resolverá en sorteo público dirigido por el Presidente de la Comisión.[23]

El Art. 3.1(2)(a) del Código Electoral de 2020, *supra*, expone que la composición ordinaria de la CEE incluye un Presidente, **un mínimo de 2 y un máximo de 3 comisionados**

---

[23] Negrilla Suplida.

**electorales propietarios. Estos poseen voz y voto y representan a los Partidos Principales.** Es decir, aquellos que en la Elección General más reciente superaron el 25% de los votos íntegros, válidos y elegibles y, al alcanzar la mayoría de estos votos, hayan conquistado las 3 primeras posiciones en los últimos comicios. Por lo tanto, como regla general, la CEE estará compuesta por los comisionados electorales propietarios que representen a los Partidos Principales que ocuparon los 3 primeros lugares en las últimas Elecciones Generales.

Ahora bien, el Art. 3.1(2)(c) y (d) del Código Electoral de 2020, *supra,* prevé que la composición ordinaria de la CEE pueda alterarse luego de los resultados de la Elección General. El **primer escenario** se encuentra en el inciso (c) y este contempla que cuando la *Certificación final del Escrutinio General* sobre los resultados de los comicios informa que **hay menos de 3 Partidos Principales**, se activará el mecanismo de adición. El mecanismo de adición es una herramienta para aumentar la composición de la CEE y, según este inciso (c), la CEE quedará conformada con el máximo de 3 comisionados electorales propietarios. Para lograrlo, se seleccionarán a los comisionados electorales adicionales de los **Partidos Estatales** con franquicia electoral -porque obtuvieron más del 2% pero menos del 25%- y alcanzaron la segunda y hasta la tercera mayor cantidad de los votos íntegros, válidos y elegibles.

En esta situación que presenta el inciso (c), será suficiente que la CEE acredite el o los 2 Partidos Estatales que obtuvieron la segunda y hasta la tercera mayor cantidad de votos íntegros, válidos y elegibles en el último evento electoral. De manera que, por ejemplo, si la CEE certifica que hay 2 Partidos Principales que cualifican para ser miembros propietarios de la

CEE, se activa el mecanismo de adición para que el Partido Estatal que obtuvo la tercera mayor cantidad de votos íntegros, válidos y elegibles ocupe el espacio disponible en la composición de la CEE.

En cambio, si la CEE certifica que hay un Partido Principal, con el mecanismo de adición, se seleccionarán los Partidos Estatales que obtuvieron la segunda y la tercera mayor cantidad de votos íntegros, válidos y elegibles para conformar la composición máxima de la CEE de 3 comisionados electorales. El inciso (g) prevé que si en la determinación de la composición máxima de la CEE existiera un empate, el Presidente de la CEE lo resolverá en sorteo público.

El **segundo supuesto** lo contempla el inciso (d) del Art. 3.2(2) del Código Electoral de 2020, *supra*, al establecer que cuando la *Certificación final del Escrutinio General o Recuento* de los recientes comicios refleje que **hay menos de 3 Partidos Principales y Partidos Estatales** elegibles para activar el mecanismo de adición, la CEE quedará integrada por 2 comisionados electorales propietarios que representarán a los dos Partidos Estatales con la mayor cantidad de **votos íntegros, válidos y elegibles** en las últimas Elecciones Generales. En este contexto hay que tener en cuenta el principio de rango o categorías. Esto es, que todo Partido Principal es Estatal pero no todo Partido Estatal es Principal; todo Partido de Mayoría es Principal pero no a la inversa.

Así que, a tenor con el Art. 3.1(2) del Código Electoral de 2020, *supra*, y los resultados certificados en el Escrutinio General o Recuento, la CEE podría estar conformada por los comisionados electorales propietarios de 2 Partidos Principales o, en su defecto, por uno del Partido Principal y otro del Partido

Estatal con la mayor cantidad de votos íntegros, válidos y elegibles.

En síntesis, de ordinario, la composición de la CEE está conformada por los 3 comisionados electorales de las colectividades clasificadas Partidos Principales que obtuvieron la mayor cantidad de los votos íntegros, válidos y elegibles en los últimos comicios. En caso de que hayan menos de 3 Partidos Principales, será necesario realizar el mecanismo de adición. De aplicarse, según la necesidad que establece el estatuto para el ejercicio de adición, los Partidos Estatales elegibles mantendrán su clasificación de partido político de acuerdo con el Art. 6.1(a) del Código Electoral de 2020, *supra*.

No obstante lo anterior, para efectos de la composición de la CEE, este mecanismo permite que los comisionados electorales adicionales de los Partidos Estatales sean reconocidos como miembros propietarios de la CEE, asimilándolos a la representación de los Partidos Principales, con todo lo que ello conlleva.

Nótese que todo el andamiaje de la CEE tiene su fundamento en los resultados del Escrutinio General para la composición máxima y para el esquema mínimo se consideran además los resultados del Recuento que certifique la CEE. **El hecho de que el Art. 3.1(2) del Código Electoral de 2020, *supra*, pronostique otras instancias en las que los Partidos Estatales puedan conformar la composición de la CEE, revela que las motivaciones legislativas al aprobar este esquema operacional van más allá de las visiones de los partidos políticos, sus respectivas franquicias y consecuentes membresías propietarias o adicionales que los representen en la CEE.**

La ciencia o lógica detrás de la composición ordinaria -e incluso en la excepcional- de la CEE es que esta representa la

muestra fiel de la voluntad del Pueblo que, al ejercer su derecho constitucional al voto, los electores expresaron su apoyo a los partidos políticos en proporción al voto íntegro y válido en la Papeleta Estatal en la reciente Elección General.

**Este andamiaje responde al principio de proporcionalidad, asegurando que los partidos políticos con mayor respaldo popular representen adecuadamente a la mayoría del electorado que los eligió.** No se trata únicamente de garantizar su participación dentro de la CEE, sino de que la jerarquización otorgada a los miembros propietarios de los partidos políticos derive directamente del respaldo electoral expresado en las urnas. Asimismo, este sistema garantiza la transparencia y estabilidad del proceso electoral mediante una distribución equitativa y proporcional del poder dentro de la CEE, organismo que administra las elecciones en Puerto Rico.

En otras palabras, la garantía de la referida distribución y estabilidad radica en que un Partido Principal, cuyo comisionado electoral es actualmente miembro propietario, podría, según los resultados de las próximas elecciones, perder esa categoría y ser reclasificado como un Partido Estatal, con el correspondiente ajuste en su representación dentro de la CEE.

Además, como mencionamos, **la formulación de la CEE está impulsada y es acorde con los cambios estructurales y administrativos para la reducción de los costos operacionales que implicaban la composición antigua de la CEE y que la Junta exigió que fuera atendida.** Esto ocurre en contraposición a la ley anterior, en dónde los comisionados electorales de todos los partidos políticos tenían voz y voto en las decisiones de la CEE aun cuando algunos de estos no representaban ni una cuarta parte

de los electores que ejercieron su derecho al voto. Pero, además, también tenían derecho a una serie de beneficios que implicaban un gasto que no se ajustaba al mandato claro del Plan Fiscal que impulsó la Junta.

En atención a este particular, el Art. 3.10(f) del Código Electoral de 2020, *supra*, estableció una cláusula transitoria que permitía a cualquier Partido Estatal, cuyo comisionado electoral fuera miembro propietario de la CEE al momento de aprobarse el Código Electoral de 2020, *supra*, a conservar su membresía con las condiciones específicas que establece el Art. 3.10(9) del Código Electoral de 2020, *supra*, hasta que la CEE certificara los resultados finales del Escrutinio General de la Elección General de 2020. Añade que este reconocimiento específico y transitorio **no se podía interpretar que se podía limitar o impedir la implementación de las demás disposiciones del Código Electoral de 2020**, *supra*, incluyendo el Balance Institucional.

Esta cláusula transicional del Art. 3.1(f) del Código Electoral de 2020, *supra*, se diseñó para evitar que los partidos políticos perdieran de inmediato su membresía y los beneficios que tenían de manera similar al que dispone el Art. 3.10(9) del Código Electoral de 2020, *supra*, en el que abundaremos más adelante. Esta disposición garantizó tanto la membresía propietaria como los beneficios hasta la Certificación Final del Escrutinio General para las Elecciones Generales que se celebrarían en el 2020. Una vez se emitiera dicha certificación a los partidos políticos que incumplieran con los requisitos para ser miembros propietarios de la CEE, según establecen los Arts. 3.1(2), 3.10 y 6.1 del Código Electoral de 2020, *supra*, no se les reconocerían los beneficios del Art. 3.10(9) del Código Electoral de 2020, *supra*. Una vez más,

la disposición transitoria estaba sujeta a la representación proporcional de los electores que participarían en los comicios del 2020.

De manera que, para las Elecciones Generales de 2024, esta cláusula de transición había cumplido su razón de existir. Por lo tanto, después de la certificación de los resultados de las Elecciones Generales del 2020, procedía la aplicación restrictiva del Art. 3.1(2) del Código Electoral de 2020, *supra*, concerniente a la composición de la CEE exclusivamente con los miembros propietarios y solo estos tienen derecho a los beneficios del Art. 3.10(9) del Código Electoral de 2020, *supra*. Desde entonces, por ley, la CEE debe estar conformada por los comisionados electorales propietarios que representan a los Partidos Principales que ocuparon los primeros 3 lugares en los comicios de 2020 y los Partidos Estatales estarían representados por los comisionados electorales adicionales.

**D. Comisionados electorales propietarios y adicionales: designación, prerrogativas, facultades y deberes**

Establecida la estructura de la composición de la CEE, resta analizar las figuras de los comisionados electorales propietarios y los adicionales. El Art. 2.3 del Código Electoral de 2020, *supra*, 16 LPRA sec. 4503, que regula las definiciones, estima los términos "Comisionado Alterno"[24] y "Comisionado Electoral" en los incisos

---

[24] En lo concerniente a los comisionados electorales alternos, los incisos (5)(6)(7)(8) del Art. 3.10 del Código Electoral de 2020, *supra*, dispone que estos son designados por los comisionados electorales propietarios o adicionales con el consentimiento del Presidente de sus respectivos partidos políticos. Los comisionados alternos no son considerados funcionarios ni empleados públicos. Del inciso (6) surge que el consentimiento del Presidente tiene que hacerse por escrito al Presidente de la CEE, para que este active el protocolo de juramentación y la tramitación administrativa y legal para que los comisionados alternos ocupen el cargo. Los comisionados alternos de los comisionados electorales propietarios recibirán una remuneración anual de $120 menos a la de estos y pueden optar por prestar sus servicios mediante nombramiento o contrato otorgado por el Presidente de la CEE. Entretanto los comisionados alternos de los adicionales reciben la dieta que disponga la CEE. Los comisionados alternos ejercerán las funciones de los Comisionados Electorales propietarios y alternos en

(27) y (28).[25] Sin embargo, no establece el significado propiamente de "Comisionado Electoral Propietario" ni del "Comisionado Electoral Adicional". Ahora bien, las características, facultades y funciones principales de ambos se encuentran en los Arts. 3.1(2) y 3.10 del Código Electoral de 2020, *supra*.

Los comisionados electorales propietarios y los adicionales son los representantes de los partidos políticos ante la CEE. La designación y el nombramiento de los comisionados electorales propietarios y adicionales (e incluso la de sus alternos) es de confianza y se formaliza mediante comunicación escrita del Presidente del partido político de estos al Presidente de la CEE.[26] Este, por su parte, deberá oficializarlo, remitirlo al Secretario de la CEE para la juramentación y, a su vez, debe realizar los trámites administrativos y legales pertinentes para que puedan ocupar el puesto, ya sea como miembro propietario o adicional.[27]

Los incisos (1) y (2) del Art. 3.10 establecen los términos del nombramiento de los comisionados electorales propietarios y adicionales. Este comienza desde que el Presidente de sus

---

caso de vacante (muerte, renuncia o incapacidad) o por ausencia hasta su reintegro o nueva designación. Su función principal es sustituir al miembro propietario en caso de que este le delegue esa responsabilidad. En ese contexto, el comisionado alterno tendrá las prerrogativas, deberes y responsabilidades del comisionado en propiedad. Véase Arts. 3.10(7) y 3.3(7) del Código Electoral de 2020 (16 LPRA 4513). Además, al igual que los miembros propietarios, los comisionados alternos que cesen en sus cargos como tales no podrán ocupar los puestos de Presidente, Presidente Alterno o Secretario de la CEE por 4 años. Art. 3.10(8) del Código Electoral de 2020, *supra*.

[25] Los Arts. 2.3(27) y (28) del Código Electoral de 2020, *supra*, definen a los comisionados alternos y propietarios de la manera siguiente: "(27) 'Comisionado Alterno' — Puede ser propietario o adicional, según definidos, en esta Ley, es la persona que sustituye al Comisionado Electoral con todas sus facultades, deberes y prerrogativas. (28) 'Comisionado Electoral' — Puede ser propietario o adicional, según definido en esta Ley, es la persona designada por el presidente de un partido estatal, legislativo, municipal o alguno de los anteriores por petición o partido nacional estatal para que le represente en la Comisión, siempre que haya cumplido con todos los requisitos de Certificación y así lo haya determinado la Comisión".

[26] Arts. 3.10(3) y (6)(a) del Código Electoral de 2020, *supra*.

[27] Art. (6)(b) del Código Electoral de 2020, *supra*.

respectivos partidos políticos remita la designación, hasta el 30 de junio del año siguiente de cada Elección General. Será así solo si, después de los últimos comicios, la CEE certifica en el Escrutinio General o su Recuento que el partido político retuvo la franquicia electoral. De lo contrario, si la CEE certifica que el partido político perdió la franquicia electoral, el nombramiento del comisionado electoral que se trate expirará a los 10 días desde la fecha de la certificación de los resultados finales del Escrutinio General o el Recuento de la reciente Elección General.[28]

Aunque comparten similitudes en su origen, existen diferencias entre ambos tipos de comisionados electorales. En específico, en cuanto a las prerrogativas, facultades y deberes dentro de la CEE. Ello se debe a que el Código Electoral de 2020, *supra*, confiere únicamente a los comisionados electorales propietarios una serie de deberes y responsabilidades administrativas que no se extienden a los comisionados electorales adicionales.

El inciso (e) del Art. 3.01 del Código Electoral de 2020, *supra*, expone lo siguiente:

> (e) Los Comisionados Electorales de los nuevos Partidos Estatales, Legislativos y Municipales por Petición que **no sean elegibles para membresía propietaria** en la Comisión, **serán reconocidos como Comisionados Electorales Adicionales con voz y voto** en la Comisión una vez esta les haya otorgado su Certificación Final como tales, según se dispone en el Artículo 6.1 de esta Ley. Estos **Comisionados Electorales Adicionales y sus respectivos Comisionados Alternos serán convocados por el Presidente a las reuniones del pleno de la** Comisión a partir del comienzo del ciclo electoral de la próxima Elección General **y cuando los asuntos a discutir, considerar o adjudicar se relacionen específicamente con los que correspondan a las categorías y las demarcaciones geoelectorales de estos Partidos Político**s, según definidas en esta Ley; y disponiéndose, que sus **votos solo serán permisibles en esos asuntos**. Los servicios de los

---

[28] Destacamos que si se tratara de que un Partido por Petición que perdió su certificación preliminar por incumplir con los requisitos consabidos en el Art. 6.1 (b) del Código Electoral de 2020, su comisionado electoral cesará funciones inmediatamente. Art. 3.10(2) del Código Electoral de 2020, *supra*.

> Comisionados Electorales Adicionales y sus Comisionados Alternos serán remunerados según la dieta que les establezca la Comisión por la asistencia a cada reunión del pleno y cada reunión en la que se les convoque por los organismos de la Comisión.

Partiendo de lo anterior, los comisionados electorales adicionales son aquellos que representan a los partidos políticos que alcanzaron la cuarta posición o subsiguientes en las recientes Elecciones Generales o son partidos nuevos que, al mantener su franquicia en esos comicios, su categoría mutó a un Partido Estatal.[29] Con relación a la controversia que atendemos, estos no son elegibles para ser miembros propietarios porque porcentualmente no superaron a los tres Partidos Principales que, además de exceder el 25%, obtuvieron las primeras tres mayores cantidades de votos íntegros, válidos y elegibles en los últimos comicios. En otras palabras, no fueron la representación de la mayoría de los electores que votaron en las recientes Elecciones Generales o, en la alternativa, estos comisionados electorales adicionales provienen de un partido emergente.

Según el postulado citado, los comisionados electorales adicionales y sus alternos recibirán una remuneración conforme a la dieta que establezca la CEE por cada reunión del Pleno y cualquier otra reunión en la que sean convocados por organismos de la CEE. Estos comisionados electorales serán convocados por el Presidente de la CEE a las reuniones del Pleno desde el inicio del ciclo electoral de la próxima Elección General.[30]

---

[29] Véase escolio núm. 17.

[30] Según el Art. 2.3 (20)(a) del Código Electoral de 2020, *supra*, el ciclo electoral al que se refiere el Art. 3.10(e) del Código Electoral de 2020, supra, de una Elección General comienza el 1 de junio del año antes del evento y termina 30 días después de que la CEE emita la Certificación final del Escrutinio General o Recuento.

Ahora bien, la propia ley dispone que la participación de los comisionados electorales adicionales será para discutir, considerar o adjudicar -**con su voz y voto**- específicamente aquellos asuntos relacionados con la categoría de la colectividad y sobre las demarcaciones geoelectorales **de los Partidos Políticos que representan.**[31] Por lo tanto, **un comisionado electoral adicional de un Partido Estatal será convocado para participar y votar del Pleno de la CEE si, dentro de la demarcación geoelectoral, puede verse afectado algún derecho que le asiste a su colectividad o sus afiliados.**

De otra parte, los comisionados electorales propietarios tienen la obligación de, junto con el Presidente de la CEE, "dirigir y supervisar los trabajos de naturaleza específicamente electoral para garantizar el máximo cumplimiento de la política pública y la Misión de la Comisión".[32] Estos "podrán hacer recomendaciones administrativas al Presidente o requerirle información sobre las operaciones de las Oficinas Administrativas".[33]

En síntesis, las funciones principales de los comisionados electorales propietarios son: participar de las reuniones ordinarias y extraordinarias durante la totalidad del cuatrienio,[34] en la aprobación de reglamentos y en la ejecución de los trámites

---

[31] Cabe destacar que las "demarcaciones geolectorales" se refiere a "la aplicación de demarcaciones geográficas al contexto electoral de Puerto Rico". Art. 2.3 (45) del Código Electoral de 2020, *supra*. En vista de lo anterior, cuando se trata de "la planificación electoral, se refiere a las demarcaciones geográficas que componen unidades electorales, precintos y municipios. En el caso de las Candidaturas a cargos públicos electivos, se refiere a alcaldías, distritos senatoriales y representativos". Art. 2.3 (45) del Código Electoral de 2020, *supra*.

[32] Art. 3.10 del Código Electoral de 2020, 16 LPRA sec. 4520.

[33] *Íd.*

[34] Art. 3.3 del Código Electoral de 2020, 16 LPRA sec. 4513.

electorales.[35] Por estas y muchas otras funciones, los comisionados electorales propietarios percibirán una remuneración anual y cualquier diferencia asignada por ley equivalente al salario de un Juez del Tribunal de Apelaciones de Puerto Rico.[36]

Igualmente, en apoyo a la ejecución de sus funciones, deberes y obligaciones, los comisionados electorales propietarios tienen derecho a una oficina en la CEE y a solicitar el nombramiento o destaque de personal de apoyo, incluyendo ayudantes ejecutivos, un abogado, oficinistas, un estadístico, un analista en planificación electoral y un coordinador de inscripción. Este personal podrá desempeñar funciones en la Comisión y en las sedes de sus partidos.

Para el señor Frontera Suau, la clasificación de los partidos políticos según descrita anteriormente y, a su vez, de los comisionados electorales adicionales en contraposición a comisionados electorales propietarios, son inconstitucionales. En específico, este aduce que las disposiciones estatutarias en controversia inciden sobre el derecho al voto, el derecho a la libre asociación y a la igual protección de las leyes. Como consecuencia de ello, procedemos a analizar la normativa referente a estos derechos constitucionales.

Ahora bien, en vista de que los foros recurridos se abstuvieron de revisar el señalamiento de la alegada inconstitucionalidad amparándose en la doctrina de autolimitación judicial, debemos comenzar con un repaso de las particularidades

---

[35] Véase Art. 3.8(17) del Código Electoral de 2020, 16 LPRA sec. 4518.

[36] El 15 de julio de 2024 se enmendó la sec. 7.001 de la Ley 201-2003, conocida como la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico de 2003 (4 LPRA sec. 25p) para que, retroactivo al 1 de julio de 2024, los jueces del Tribunal de Apelaciones de Puerto Rico devenguen un salario anual de $139,563.

de esta doctrina. Particularmente, veamos cuándo exactamente es que los tribunales deberán aplicarla.

**E.   Autolimitación Judicial**

Sabido es que el Poder Judicial es la rama gubernamental encargada de interpretar y aplicar la ley. No obstante, esta función se encuentra limitada por las Doctrinas de Autolimitación judicial, que tiene su génesis en consideraciones constitucionales y prudenciales.[37] Entre las Doctrinas de Autolimitación, o como un principio que emana de estas, encontramos la **Doctrina de Evitación Constitucional** (*Constitutional Avoidance Doctrine o Canon of Constitutional Avoidance o Avoidance Canon*).[38] Véanse *Jennings v. Rodríguez*, 583 US 281, 296 (2018), *Clark v. Martínez,* 543 US 371, 385 (2005), *United States v. Davis*, 588 US 445, 463 (2019).

Su activación tiene lugar cuando el tribunal es llamado a evaluar la validez constitucional de una pieza legislativa.[39] Conforme a esta doctrina, en *E.L.A. v. Aguayo*, 80 DPR 552 (1958), expresamos que "[c]uando se cuestiona la validez de una ley del Congreso, y aun cuando se suscite una duda seria sobre su constitucionalidad, es un principio cardinal que esta Corte primero se asegurará de que existe una interpretación razonable de la ley, que le permita soslayar la cuestión constitucional".[40]

---

[37] Son varias las Doctrinas de autolimitación que con múltiples propósitos se han desarrollado a través de los años. Por ejemplo, la **Doctrina de cuestión política**; **Doctrinas de justiciabilidad** (*Standing, Mootness, Ripeness, Advisory Opinions*); **Doctrinas de abstención** (*Abstención de Younger, Abstención de Pullman, etc.*); **Doctrina de agotamiento de remedios administrativos**, etc.

[38] Véase *Clark v. Martínez*, 543 US 371 (2005).

[39] *Íd.*, pág. 337.

[40] *E.L.A. v. Aguayo*, 80 DPR 552 (1958) (citando a *Ashwander v. Tennessee Valley Authority*, 297 US 288, 346 (1935)).

En su concepción clásica la Doctrina de Evitación Constitucional requiere que una vez los foros judiciales se enfrenten a una alegada ley inconstitucional, deberán auscultar si se puede resolver el asunto únicamente mediante un análisis del estatuto.[41]

De esta manera, los tribunales evitan los dictámenes precipitados o innecesarios en la medida en que decidirán esas cuestiones solo cuando no puedan disponer de otra manera del caso ante su consideración.[42]

En esa dirección, en *Domínguez Maldonado v. E.L.A.*, 137 DPR 954, 964 (1995), determinamos que los planteamientos constitucionales no deben abordarse cuando un caso puede resolverse mediante una de las maneras siguientes: (1) mediante un análisis estatutario válido; (2) en armonía con los criterios de las partes y en consonancia con los mejores fines de la justicia; (3) al existir una interpretación razonable de la legislación que permita soslayar la cuestión constitucional, y (4) porque la controversia puede quedar resuelta definitivamente por otros fundamentos.

Ahora bien, **luego de llamado el tribunal para evaluar la constitucionalidad de una ley, y descartada la posibilidad de resolver la controversia acudiendo únicamente al estatuto, los foros judiciales están obligados a examinar la cuestión constitucional planteada.** Abundemos sobre este particular para determinar finalmente si esta doctrina era aplicable a este caso.

En el caso ante nuestra consideración, **el señor Frontera Suau acudió ante el foro de primera instancia y planteó dos asuntos que requerían dos remedios distintos.** El primero iba dirigido a la

---

[41] *Com. PNP v. CEE et al.*, 197 DPR 914, 926 (2017).

[42] *Milán Rodríguez v. Muñoz*, 110 DPR 610 (1981).

permanencia en su puesto como comisionado electoral y de su equipo de trabajo hasta el 30 de junio de 2025. En el segundo, impugnó la constitucionalidad del esquema organizacional de la CEE con miras a continuar como comisionado electoral propietario a partir del 1 de julio de 2025.

Los tribunales *a quo* rechazaron a atender el planteamiento constitucional fundamentados en la doctrina de autolimitación en su acepción de Evitación Constitucional. Ahora bien, la aplicación de esta doctrina requiere como punto inicial tener en cuenta cuál es el remedio que se solicita. Como sabemos, en el ámbito de un trámite judicial el remedio es aquel que el promovente suplica en una causa de acción porque entiende que puede hacer valer el derecho o el asunto planteado al palio de un reglamento, una ley o la Constitución.[43]

De esta forma, en ocasiones la concesión de un remedio puede surgir tanto de una fuente reglamentaria o estatutaria, así como de la propia Constitución. Entiéndase que los fundamentos para la concesión o no del remedio solicitado surgen del estatuto o el reglamento impugnado y de la Constitución. En esas circunstancias, conforme a la Doctrina de Evitación Constitucional, el Tribunal primero evaluará si la concesión de dicho remedio es posible con una mirada exclusiva a la ley o el reglamento que esté en cuestionamiento. Este supuesto representa expresamente la sencillez de la doctrina de Evitación Constitucional en la que los foros judiciales se abstienen de adentrarse en la constitucionalidad de una ley.

---

[43] Véase concepto "remedio". I. Rivera García, *Diccionario de términos jurídicos*, 2da ed., New Hampshire, Ed. Equity, págs. 239-240.

Por otro lado, en ocasiones el Tribunal se enfrenta con la realidad de que no es posible conceder el remedio recurriendo a un análisis estatutario. En esos casos el foro judicial está obligado a atender el reclamo de inconstitucionalidad presentado por la parte en la alternativa, evaluando si finalmente este procede o no.

Queda claro entonces que esta doctrina se visualizó para evitar considerar los planteamientos de derechos constitucionales cuando sea posible conceder el remedio solicitado mediante una interpretación armoniosa de la ley. Así, en la concepción clásica de esta doctrina, cuando la causa de acción de un demandante con relación a una interpretación estatutaria no prevalece, pero éste, a su vez ha levantado un planteamiento constitucional en la alternativa, los tribunales estamos obligados a atenderlo. De otra manera, el demandante terminaría no prevaleciendo en su causa sin que se hubiera atendido un planteamiento que presentó alternativamente. Y es que debemos tener presente que la implementación de la Doctrina de Evitación Constitucional no debe degenerar en una limitación del derecho de los ciudadanos a que los tribunales le concedan un remedio cuando éste proceda, sino en evitar, cuando sea posible, que para hacerlo tengamos que considerar aspectos constitucionales.

Por otro lado, otro escenario surge cuando el promovente solicita más de un remedio o solicita remedios distintos de asuntos planteados que pueden incidir entre sí, como ocurrió en el caso que nos ocupa. Ante este cuadro, los foros judiciales deberán evaluar cada remedio a la luz del estatuto aplicable. Si del estatuto surgen los remedios solicitados, se descartaría la

evaluación constitucional, tal y como dispone la Doctrina de Evitación Constitucional.

## F. Derecho al voto y a la libre asociación

El señor Frontera Suau señaló en su *Recurso de Certiorari* que la composición actual de la CEE, según el Código Electoral de 2020, *supra*, viola el derecho a la igualdad de participación política al imponer restricciones desproporcionadas a partidos como Proyecto Dignidad. Añade que "relegar injustificadamente a un partido debidamente instituido, lesiona no solo los derechos asociativos de sus miembros, sino también el derecho al voto de miles de ciudadanos que apoyan a estas colectividades, cuyos votos no recibirían la misma protección y fiscalización que los emitidos a favor de estos partidos mayoritarios".[44] En vista de este planteamiento, debemos repasar la normativa referente a los derechos de libre asociación y al voto. De esa forma podremos evaluar si el Peticionario tiene un señalamiento válido.

Como sabemos, el derecho al voto es una de las garantías fundamentales de nuestro ordenamiento constitucional.[45] Tanto así que nuestra Carta Magna estableció que "[l]as leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral".[46]

En *McClintock v. Rivera Schatz*, 171 DPR 584 (2007) expresamos que este derecho, el cual es de la más alta envergadura,

---

[44] *ALEGATO DE JUAN M. FRONTERA SUAU, EN SU CAPACIDAD DE COMISIONADO ELECTORAL DE PROYECTO DIGNIDAD, REFERENTE A LA INCONSTITUCIONALIDAD DE LOS ARTÍCULOS 3.1(2)(A)-(F) Y 6.1 DEL CÓDIGO ELECTORAL DE 2020* del Sr. Juan M. Frontera Suau en la pág. 2.

[45] *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31 (2009).

[46] Art. II, Sec. 2, Const. PR, LPRA, Tomo 1, ed. 2016, pág. 283.

incluye el **derecho a formar agrupaciones políticas para participar en los eventos electorales**. Así, pues, el derecho al voto comprende la garantía de que se incluyan en las papeletas que se utilizan el día del evento eleccionario las opciones que reflejan las corrientes políticas contemporáneas del elector.[47]

Ahora bien, una vez los tribunales se enfrentan a una supuesta violación al derecho al voto, su tarea será analizar si la ley impugnada obstaculiza de alguna forma el derecho del elector a expresarse y a votar por lo que crea.

**Sin embargo, corresponde a la parte que así lo reclama demostrar tal obstaculización de manera específica y no con meras generalidades. Recordemos que no se trata de si los demás están en mejor posición que el reclamante, pues tal desigualdad puede estar justificada, sino de si tal desigualdad constituye una violación a un derecho constitucional, en este caso, el derecho al voto. En el caso que nos ocupa, de ninguna forma nos enfrentamos a una obstaculización del proceso eleccionario, sino a una disposición que facilita el proceso administrativo dentro de la CEE, que recalcamos, se encuentra dentro de las prerrogativas constitucionales de la Asamblea Legislativa.**

Expuesto lo anterior, pasemos a repasar el derecho a la igual protección de las leyes.

G.  **Igual Protección de las Leyes**

El principio cardinal en que se funda la igual protección de las leyes es el de "trato similar para personas similarmente situadas".[48] Este derecho se encuentra consagrado en la Sección 7

---

[47] *McClintock v. Rivera Schatz*, 171 DPR 584 (2007).

[48] Véase R. Serrano Geyls, *Derecho constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. U.I.A.P.R. 1997, Vol. II, pág. 1082.

del Artículo II de la Constitución de Puerto Rico. Específicamente, la cláusula dispone que "[n]inguna persona será privada de su libertad o propiedad sin debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes".[49]

No obstante lo anterior, este Tribunal ha reiterado que el principio de la igual protección de las leyes, "no exige que siempre se dé un trato igual a todos los ciudadanos sino que prohíbe un trato desigual e injustificado".[50] Así, siempre que el gobierno observe cuidadosamente aquella norma básica de tratar similarmente a quienes se encuentren similarmente situados y, más importante aún, cuente con un propósito legítimo para la creación de la clasificación, los foros judiciales no podrán obstaculizar su implementación.

Cónsono con lo anterior, el profesor José Julián Álvarez González expresó que:

> [T]oda ley clasifica, en alguna medida. Aun las más abarcadoras y aparentemente uniformes distinguen entre las personas... [l]a aplicación judicial del principio de igualdad constitucional, por lo tanto, tiene que acometer esa tarea consciente de que las clasificaciones legislativas son tan necesarias como inevitables, por lo que debe haber razones de peso que identifiquen aquellas clasificaciones que trascienden el ámbito de lo permisible.[51]

De lo precitado surge que en el quehacer el legislador inevitablemente establece clasificaciones. Así, pues, la tarea de los foros judiciales no es impedir la creación de estas

---

[49] *Art. II, Sec. 7, Const. PR*, LPRA, Tomo 1, ed. 2008, pág. 296.

[50] *Domínguez Castro et al. v. E.L.A. I*, *supra*, págs. 15-16.

[51] J.J. Álvarez González, *Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos*, Bogotá, Ed. Temis, 2009; véase, también, *AAR, Ex parte*, 187 DPR 835 (2013).

clasificaciones, sino de cerciorarse que no creen desigualdades indebidas o irrazonables.[52]

Ahora bien, hemos expresado que cuando se impugna un estatuto electoral a base de que este contiene una clasificación que atenta en contra de la igual protección de las leyes, los foros judiciales deben auscultar lo siguiente: (1) si el estatuto es sospechoso de su faz; (2) si descansa en criterios constitucionales impermisibles y, (3) si tiene el efecto de impedir o gravar sustancialmente el ejercicio de la franquicia electoral.[53]

Tomando en cuenta lo anterior, los tribunales tienen el deber de examinar la razonabilidad de la clasificación. Para ello, hemos determinado que en las situaciones en las que se cuestione una clasificación legislativa al amparo de la Cláusula de Igual Protección de las Leyes, los tribunales deben recurrir a uno de dos tipos de escrutinios: el escrutinio tradicional o el escrutinio estricto.[54]

### i. Escrutinio Tradicional

De ordinario, al atender la impugnación de un estatuto o de una actuación gubernamental por atentar contra la Igual Protección de las Leyes, los tribunales utilizarán el escrutinio tradicional.

**El escrutinio tradicional exige que el Estado demuestre la existencia de un interés legítimo en la actuación gubernamental, y que el medio utilizado para adelantar dicho interés tiene un nexo racional.** Así, pues, "[l]a ley será constitucional siempre

---

[52] R. Serrano Geyls, *op. cit.*, pág. 1081.

[53] *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 DPR 248 (1980).

[54] *Domínguez Castro et al. v. E.L.A. I*, *supra*, pág. 71.

que razonablemente pueda concebirse una situación que justifique la clasificación".[55]

Al emplearse el escrutinio tradicional, la clasificación legislativa no debe ser declarada inválida o inconstitucional salvo que sea arbitraria. Para determinar que en efecto es arbitraria, el Peticionario debe demostrar que no existe un interés legítimo del Estado o que no pueda establecerse nexo racional alguno entre la clasificación y un interés estatal. Hemos resuelto que, siempre que pueda concebirse razonablemente una situación de hechos que justifique la clasificación, la legislación o actuación impugnada será constitucional.[56]

Cabe destacar que este Tribunal ha establecido que cuando el planteamiento de inconstitucionalidad se hace contra una legislación de tipo económico o social, el criterio tradicional mínimo solo exigirá que la clasificación no sea arbitraria y que ésta pueda establecer un nexo racional con los propósitos del estatuto.[57]

En síntesis, en aquellas ocasiones donde los tribunales utilicen el escrutinio tradicional, las clasificaciones sobrevivirán siempre y cuando no sean arbitrarias ni irracionales.[58]

**ii. Escrutinio Estricto**

Por otro lado, será imprescindible que los foros judiciales ausculten si, en su ejercicio de legislar, el Estado estableció una clasificación sospechosa o si atentó contra un derecho

---

[55] *Berberena v. Echegoyen*, 128 DPR 864 (1991).

[56] *San Miguel Lorenzana v. E.L.A.*, 134 DPR 405 (1993).

[57] *Rodríguez Rodríguez v. E.L.A.*, 130 DPR 562 (1992).

[58] *Domínguez Castro et al. v. E.L.A. I*, *supra*, pág. 72.

fundamental. En Puerto Rico, las clasificaciones sospechosas están expresamente enumeradas en la Sec. 1 del Art. II de nuestra Constitución, *supra*, a saber: raza, color, sexo, nacimiento, origen o condición social, ideas políticas, ideas religiosas o nacionalidad.[59] En cuanto a los derechos fundamentales, se reconocen como tal el derecho a la vida, a la libertad de culto, a la libertad de expresión, al voto, a la protección contra ataques abusivos a la honra y el derecho de intimidad.[60]

La diferencia de mayor envergadura al evaluar una ley al amparo del escrutinio estricto es que se presume que la actuación del Estado es inconstitucional y se coloca el peso de la prueba sobre el Estado, que deberá demostrar: (1) que persigue un interés público apremiante, de superior jerarquía; (2) que la clasificación discriminatoria es necesaria para alcanzar ese fin; y (3) que no existen medios menos onerosos para hacerlo.

Empero, en caso de que la legislación impugnada no se fundamente en una clasificación sospechosa o en la violación de un derecho fundamental, los foros judiciales prescindirán de utilizar el escrutinio estricto.

Expuesto lo anterior y evaluada la normativa referente a la cláusula de igual protección de las leyes, impera adentrarnos en el llamado "axioma" de igualdad que, según el Peticionario, existe entre los partidos políticos.

## H. Axioma de Igualdad entre los Partidos Políticos

Para finalizar el aspecto constitucional de la discusión, debemos evaluar el alegado "axioma de igualdad" que, según el

---

[59] *Art. II, Sec. 1, Const. PR*, LPRA, Tomo 1.

[60] *San Miguel Lorenzana v. E.L.A.*, *supra*, pág. 425.

Peticionario, surge tanto de la Constitución, como del caso *P.R.P. v. E.L.A., supra*.

El Peticionario sostiene que el principio de igualdad electoral tiene un origen histórico en la Sección 6 del Artículo IX, bajo las disposiciones transitorias de la Constitución, donde se establece que los partidos políticos continuarán disfrutando de los derechos que les reconoce la ley electoral, siempre que cumplan con los requisitos mínimos de inscripción aplicables al momento de entrada en vigor de la Constitución.[61]

Añade que, actualmente, se reconoce que las Secciones 1 y 2 de la Carta de Derechos imponen límites al poder legislativo para modificar las reglas de formación de los partidos políticos.[62] A modo de repaso, el texto íntegro de la Sección 1 reza que:

> La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana.[63]

Por su parte, según mencionamos anteriormente, la Sección 2 dispone que "[l]as leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral".[64]

Ahora bien, en *P.R.P. v. E.L.A., supra*, este Tribunal (por voz del Juez Asociado señor Negrón García) se enfrentó a un reclamo

---

[61] Véase Const. PR art. IX, sec. 6.

[62] Véase Const. PR art. II, secs. 1 y 2.

[63] *Íd.*

[64] *Íd.*

del Partido de Renovación Puertorriqueña a designar sus representantes en las Juntas de Inscripción Permanentes de las Comisiones Locales de Elecciones con los mismos derechos y prerrogativas de los correspondientes a los partidos principales. En aquella ocasión determinamos que la clasificación entre partidos principales y por petición resultaba, en el contexto de los hechos del caso, irrazonable e injustificada.[65]

El razonamiento del Tribunal, por voz del Juez Negrón García, para tal conclusión fue que, si bien es cierto que la Asamblea Legislativa posee una amplia potestad para determinar y regular todo lo concerniente al proceso electoral, no es una prerrogativa absoluta.[66] De mayor importancia para el caso ante nos es que, en esa ocasión, el Tribunal expresó por fíat judicial que la reglamentación se rige por el axioma de igualdad inmerso en la Constitución.[67]

Sin embargo, en *Com. CNP v. CEE et al*, 197 DPR 914 (2017) revocamos *P.P.D. v. Gobernador II*, 136 DPR 916 (1994), al concluir categóricamente y luego de un estudio exhaustivo del historial de la Constitución, que el llamado axioma de igualdad económica entre los partidos políticos, "no existe en la Constitución".[68] Dijimos lo anterior, luego de exponer cual es el historial constitucional y la opinión de estudiosos del tema. Añadimos, además, que el ex Juez Asociado señor Negrón García admitió, en una opinión concurrente a la que se unieron los jueces Dávila e Irizarry

---

[65] *P.R.P. v. E.L.A.*, 115 DPR 631 (1984).

[66] *P.R.P. v. E.L.A.*, supra, págs. 636-637 (citando a P.S.P., P.P.D., P.I.P. v. Romero Barceló, supra, pág. 256).

[67] *P.R.P. v. E.L.A.*, supra, pág. 637.

[68] *Com. CNP v. CEE et al*, 197 DPR 914, 928 (2017). Negrilla Suplida.

Yunqué,[69] que el deseo de lograr paridad económica entre los partidos políticos no alcanzó linaje constitucional, sino que tuvo alumbramiento estatutario.[70] De hecho, ya habíamos concluido eso en *Marrero v. Mun. De Morovis*, 115 DPR 643 (1984).

Por otro lado, analizando la Ley Núm. 110 de 30 de junio de 1957, la cual se aprobó para establecer el Fondo Electoral, aclaramos que la Asamblea Legislativa no estableció un principio universal de igualdad que se extendiera a todas las leyes que se aprobaran en el futuro. Debido a ello, añadimos que "de ninguna parte se desprende el principio de que todos los partidos debían ser iguales en materia económica".[71] Como corolario, concluimos que no es correcta la aplicación automática de un principio universal e ilimitado de igualdad económica entre los partidos políticos.

## III

En la resolución del presente caso, los foros recurridos determinaron que era prudente abstenerse de atender la constitucionalidad de una serie de artículos del Código Electoral que rigen la composición de la CEE, amparándose en la Doctrina de Evitación Constitucional. En vista de lo anterior, es menester determinar, como requisito *sine qua non,* si los tribunales *a quo* erraron al no atender el planteamiento constitucional por la razón aludida. Decimos esto, porque, si los foros *a quo* acertaron en su fundamento, esta curia estaría igualmente impedida de atenderlo.

De entrada, concluimos que si bien es cierto que nuestra jurisprudencia provee para la Doctrina de Evitación Constitucional

---

[69] *P.S.P. v. Srio de Hacienda*, 110 DPR 313, 321 (1988).

[70] *Com. CNP v. CEE et al,* supra, pág. 930.

[71] *Íd.,* pág. 931.

dadas las circunstancias adecuadas, el presente caso no era una de ellas.

Según mencionamos, el Tribunal de Primera Instancia reconoció que tenía ante si dos controversias. La primera es sobre el cierre operacional de la oficina del comisionado de Proyecto Dignidad y la destitución de sus empleados. La segunda es la declaración de inconstitucionalidad del esquema de gobierno y composición de la Comisión Estatal de Elecciones para que este partido fuera reconocido como miembro propietario.

Tomado en cuenta lo anterior, el foro de primera instancia concluyó que "indudablemente la presente controversia es susceptible de ser resuelta mediante un análisis puramente estatutario del Código Electoral y sus disposiciones relacionadas a los partidos políticos y sus comisionados electorales, por lo que se hace innecesario cualquier consideración constitucional al respecto".

Por su parte, en su *Sentencia* el Tribunal de Apelaciones simplemente hizo eco al razonamiento del foro de primera instancia y concluyó que "no era necesario considerar el aspecto constitucional levantado por el señor Frontera Suau y Proyecto Dignidad, concerniente a la estructura mediante la cual el Código Electoral de Puerto Rico de 2020 imparte el poder entre los partidos en la Comisión Estatal de Elecciones".

Sin embargo, los distinguidos foros *a quo* pasaron por alto un importante detalle que saca este caso del ámbito de la Doctrina de Evitación Constitucional.

En su causa de acción el peticionario no solo planteó **remedios distintos** aunque relacionados, sino que **el fundamento argumentado en cada uno de ellos es <u>único</u> y diferente**. Esto es,

los argumentos para cada remedio solicitado tenían bases jurídicas distintas, y ninguno fue acompañado con argumentos en la alternativa. Notemos que en su primera solicitud de remedio el peticionario Frontera Suau no impugnó la constitucionalidad del Art. 3.10 en el que reclamaba que tenía derecho a permanecer en su puesto con todo su equipo de trabajo hasta el próximo 30 de junio de 2025. A ese planteamiento los tribunales *a quo* no le dieron paso al determinar como correcta la interpretación de la Presidenta de la CEE del referido artículo, en el sentido de que el peticionario y todos los funcionarios de PD tendrían que cesar en sus puestos efectivo el 10 de enero de 2025. Atendido ese reclamo, procedía entonces atender el segundo, cuyo fundamento es uno constitucional dirigido a impugnar la composición de la CEE bajo el Código Electoral de 2020, *supra* (Arts. 3.1 (2)(a)-(f) y 6.1).

Esto pues, tras adjudicarse que la Presidenta Alterna de la CEE resolvió correctamente según el Art. 3.10 del Código Electoral de 2020, *supra*, y no pudiendo resolverse la segunda reclamación por la vía estatutaria, quedaba por dirimir si su adjudicación -y por ende los otros artículos impugnados del Código- violaban los derechos de PD y su Comisionado Electoral.[72]

Sobre ese particular, el señor Frontera Suau aduce que el esquema operacional dispuesto en el Código Electoral de 2020, *infra*, en sus Arts. 3.1(2)(a)-(f) y 6.1 son inconstitucionales porque, según él, promueven el trato desigual entre los Partidos Políticos con franquicia electoral. En específico, señala que el

---

[72] Cabe destacar que, según expusiéramos en el recuento fáctico, el señor Frontera Suau acudió ante este Tribunal con dos señalamientos de error. Empero, en cuanto al señalamiento de error referente a la destitución de los empleados de Proyecto Dignidad, dejamos inalterado lo dispuesto por los foros *a quo* y expedimos el *Recurso de Certiorari* para atender únicamente el señalamiento referente a la alegada inconstitucionalidad de los Arts. 3.1(2)(a)-(f) y 6.1 del Código Electoral de 2020, *supra*.

referido esquema contraviene el derecho a la libre asociación, el derecho al voto y el derecho a la igual protección de las leyes. No le asiste la razón.

En primer lugar, debemos atender el planteamiento del alegado ataque por parte del legislador a los derechos de libre asociación y voto de Proyecto Dignidad. El Peticionario entiende que limitar a tres el número de comisionados electorales propietarios impide de alguna forma la realización de los derechos anteriormente mencionados. No vemos en qué manera los artículos impugnados atentan en contra de estos derechos. El esquema operacional provisto por el Código Electoral de 2020, *supra*, provee para que un partido con franquicia electoral no cuente con un comisionado electoral propietario. Si bien es cierto que fue precisamente eso lo que le sucedió a Proyecto Dignidad, fue la voluntad del Pueblo por conducta de los votos lo que materializó esa realidad. Nada impedía que fuera Proyecto Dignidad quien obtuviera una de esas tres posiciones. El Peticionario no nos puso en posición para concluir cómo el derecho al voto de sus afiliados y la libertad de asociación de estos se violó con la nueva composición de la CEE, según los artículos impugnados.[73]

La nueva composición de la CEE no obstaculiza de forma alguna la prerrogativa electoral de los afiliados de Proyecto Dignidad. El partido cuenta con un comisionado electoral adicional con voz y voto para defender los asuntos que podrían afectar directamente los intereses de esos mismos afiliados. Además, el Código Electoral de 2020, *supra*, garantiza que se incluyan las

---

[73] De hecho, tomamos conocimiento judicial de que la actuación electoral de PD en este último sufragio, habiendo contado con todo lo que hoy reclama para evitar una alegada violación a los derechos de sus electores, fue inferior a la del año 2020, en la que no contaban con tal estructura en la CEE.

opciones que reflejan las corrientes políticas de Proyecto Dignidad en las papeletas que se utilizarían el día del evento eleccionario.

Por todo lo anterior, no nos convence el argumento del señor Frontera Suau y concluimos que el esquema operacional vigente en la CEE no quebranta el derecho al voto y a la libre asociación de Proyecto Dignidad. Pasemos ahora al argumento de igual protección de las leyes.

Según el derecho aplicable, cuando se impugna un estatuto electoral fundamentado en que este contiene una clasificación que, se alega, atenta en contra de la igual protección de las leyes, los foros judiciales deben auscultar lo siguiente: (1) si el estatuto es sospechoso de su faz; (2) si descansa en criterios constitucionales impermisibles (si el estatuto atenta en contra de derechos fundamentales), (3) si tiene el efecto de impedir o gravar sustancialmente el ejercicio de la franquicia electoral.[74] En caso de responder en la negativa, el tribunal no debe analizar la razonabilidad de dicha clasificación a base de un escrutinio estricto, sino que debe usar el análisis tradicional.[75]

Para arribar al escrutinio a utilizar debemos responder las siguientes interrogantes: (1) ¿Cuáles son las clasificaciones sospechosas?; (2) ¿Cuáles son los criterios constitucionales impermisibles?; y (3) ¿Qué es la franquicia electoral?

Este Tribunal ha resuelto en reiteradas ocasiones que son clasificaciones sospechosas aquellas que se establecen por razón de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o religiosas y nacionalidad.[76] Por su parte,

---

[74] *P.S.P., P.P.D., P.I.P. v. Romero Barceló, supra.*, pág. 261.

[75] *Íd.*

[76] *Garib Bazaín v. Hosp. Aux. Mutuo et al*, 204 DPR 601 (2020); *AAR, Ex Parte*, *supra*.

también hemos reconocido como criterios constitucionales impermisibles o derechos fundamentales el derecho a la vida, a la libertad de culto, a la libertad de expresión, al voto y el derecho a la intimidad.[77]

En cuanto a la franquicia electoral, el Código Electoral de 2020, *supra*, la define como la "[c]oncesión de derechos y prerrogativas que esta Ley y la Comisión le reconocen a un Partido Político por su demostrado apoyo electoral en la más reciente Elección General dentro de las cantidades mínimas de votos obtenidos y según sus respectivas categorías como Partidos Políticos".[78]

Expuesto lo anterior, para proceder con el análisis debemos detenernos en los artículos del Código Electoral de 2020, *supra*, que se encuentran en la médula de la controversia. A grandes rasgos, los Arts. 3.1(2)(a)-(f) disponen cuál será la composición de la Comisión Estatal de Elecciones y delimita a un máximo de 3 el número total de comisionados electorales propietarios que tendrán voz y voto en todos los asuntos ante la CEE. En contraposición, para los partidos políticos que no sean elegibles para membresía propietaria en la Comisión, el articulado provee para que ostenten el puesto de comisionados electorales adicionales, los cuales tendrán voz y voto en asuntos específicos. Especialmente, en aquellos asuntos en los que el partido en cuestión se pueda ver directamente afectado. Por su parte, el artículo 6.1 expone las categorías de partidos políticos: desde "Partido Estatal" hasta "Partido Municipal".

---

[77] *Rodríguez Pagán v. Depto. Servicios Sociales*, 132 DPR 617 (1993).

[78] Art. 2.3 del Código Electoral de 2020, 16 LPRA sec. 4503.

Entonces, **¿contienen en alguna medida los artículos precitados clasificaciones sospechosas? ¿atentan en contra de derechos fundamentales? ¿agravan el ejercicio de la franquicia electoral? Concluimos que no.** Los artículos impugnados: no contienen clasificaciones que sean sospechosas de su faz; tampoco descansan en criterios constitucionales impermisibles; y mucho menos impiden el ejercicio de la franquicia electoral.

En vista de lo anterior, el señalamiento del Peticionario incumple con los criterios que nos impulse a utilizar el escrutinio estricto. Así, pues, **debemos evaluar si el Estado demostró la existencia de un interés legítimo en su actuación gubernamental, y si el medio utilizado para adelantar dicho interés tiene un nexo racional.**

De la Exposición de Motivos del Código Electoral de 2020, *supra*, surge que este nuevo Código Electoral está fundamentado en los siguientes principios: "Modernizar y reestructurar la Comisión Estatal de Elecciones […] para que sea una **entidad pública más accesible, eficiente y menos costosa para los contribuyentes**". Añade que este nuevo Código, el cual se creó conforme al mandato expreso de la Junta y garantiza la continuidad operacional de la CEE adoptando nuevas condiciones para modernizar a esta agencia, así como hacerla menos costosa y más eficiente sin sacrificar el derecho del Pueblo, el Soberano, a ser convocado en cualquier momento para ejercer su derecho al voto cuando fuese necesario, según se desprende de nuestra Constitución.

Es incuestionable que, de ordinario, el esquema operacional actual de la CEE provee para la permanencia de tres comisionados electorales propietarios. Sin embargo, entendemos que el Código Electoral de 2020, *supra*, fomenta un proceso electoral justo

mediante el cual todos los partidos tienen la posibilidad de resultar airosos.

La situación económica sin precedente por la cual atraviesa el Gobierno es más que razón suficiente para la implementación de medidas que reduzcan los costos operacionales. Así, este nuevo Código cuenta con un perfil necesario para atemperar el sano ejercicio de nuestra democracia con una situación económica que no permite, como ocurría en el pasado, gastos que no fueran los estrictamente necesarios. Debido a ello, contrario a lo expuesto por el Peticionario, no se trata de una ley electoral que plasme líneas o visiones político-partidistas y mucho menos de una que discrimine contra partidos minoritarios. Se trata de una pieza legislativa necesaria para sobrellevar la precaria realidad que atravesamos, sin dejar de garantizar el derecho constitucional al voto mediante el ente que lo administra, la CEE.

El Código Electoral de 2020, *supra*, tiene como objetivo principal empoderar a los electores facilitando su acceso a los procesos relacionados con el ejercicio de su derecho al voto. Ello, al considerar que el elector es el eje y protagonista del sistema electoral y debe serlo sin limitaciones ni condiciones procesales que, irrazonablemente menoscaben, limiten o compliquen el ejercicio del voto y su derecho a ser aspirante o candidato a cualquier cargo. Al mismo tiempo, el legislador tuvo la obligación de atemperar ese importante propósito con la situación económica del Gobierno y las exigencias de la Junta. Eso se tradujo en un esquema operacional sin trabas costosas que potencialmente podrían no solo obstaculizar el proceso democrático, sino interrumpir las funciones de la CEE en su totalidad. **Este fin, nos parece, es evidentemente legítimo.**

Al considerar que lo que exige el criterio del escrutinio racional es que el objetivo de la ley tenga alguna relación con los medios que se emplean para lograrlos, debemos concluir que la legislación aquí discutida es constitucionalmente válida. Nos parece enteramente razonable pensar que el legislador quisiera limitar el número de comisionados electorales propietarios cuando ello implicase la protección de la ininterrumpida labor de la CEE.

Como corolario de lo anterior, **concluimos que el Estado contó con un interés legítimo en la formulación de este nuevo Código Electoral que no creó trabas innecesarias en la consecución del éxito político-partidista.**

Finalmente, en su exposición del derecho, el Peticionario aludió extensamente a nuestra opinión en *P.R.P. v. E.L.A.*, *supra*. En particular, señaló que "[e]l esquema [anti-minorías] contenido en el Código Electoral debería ser considerado como insostenible bajo dicho caso".[79] Sin embargo, tal y como resolvimos en *Com. CNP v. CEE*, supra, **no hay duda de que el principio de igualdad económica entre los partidos no es de estirpe constitucional**. Así, descartamos el derecho constitucional ficticio creado por *fíat judicial* en *P.R.P. v. E.L.A.*, *supra*.

Recalcamos hoy para el beneficio de las partes y la posteridad que las normas constitucionales protegen solo la igualdad ante la ley y, contrario a lo expuesto por el Peticionario, no garantizan la igualdad económica, ni de ninguna otra índole que no sea la jurídica.

---

[79] *Certiorari* del Sr. Juan M. Frontera Suau en la pág. 22.

**IV**

Por los fundamentos expuestos, concluimos que los Artículos 3.1(2)(a)-(f) y el Artículo 6.1 del Código Electoral de 2020, *supra*, son constitucionales.

Se dictará Sentencia de conformidad.

Erick V. Kolthoff Caraballo
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Juan M. Frontera Suau, en su capacidad de Comisionado Electoral de Proyecto Dignidad, Proyecto Dignidad<br><br>    Peticionario<br><br>    v.<br><br>Jessika Padilla Rivera, en su capacidad oficial como Presidente Interino de la Comisión Estatal de Elecciones (CEE); Aníbal Vega Borges, en su capacidad oficial como Comisionado Electoral de Partido Nuevo Progresista; Karla M. Angleró González, en su capacidad oficial como Comisionada Electoral de Partido Popular Democrático; Lillian M. Aponte Dones, en su capacidad oficial como Comisionada Electoral del Movimiento Victoria Ciudadana; Roberto Iván Aponte Berríos, en su capacidad oficial como Comisionado Electoral del Partido Independentista Puertorriqueño; Estado Libre Asociado de Puerto Rico a través de la Secretaria de Justicia Janet Parra Mercado en su carácter oficial<br><br>    Recurridos | CC-2025-0094 | Certiorari |

SENTENCIA

En San Juan, Puerto Rico, a 16 de mayo de 2025.

Por los fundamentos antes expuestos en la Opinión que antecede la cual se hace formar parte íntegra de la presente, concluimos que los Artículos 3.1(2)(a)-(f) y 6.1 del Código Electoral de Puerto Rico de 2020, Ley Núm. 58 de 20 de junio de 2020, según enmendada, 16 LPRA secs. 4511(2)(a)-(f) y 4591, son constitucionales.

Así lo pronunció, manda el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez disiente y emitió las expresiones siguientes:

Discrepo del proceder de una mayoría de este Tribunal. Por entender que los artículos objeto de la controversia ante nuestra consideración son inconstitucionales, comparto las posturas que el Juez Asociado señor Estrella Martínez y el Juez Asociado señor Colón Pérez adelantan en sus escritos.

No obstante, entiendo menester añadir que, en el ejercicio de considerar los contornos de la doctrina de autolimitación judicial, la Opinión mayoritaria la reinterpreta acomodaticiamente, a modo de subterfugio, para auscultar la constitucionalidad de los artículos del Código Electoral en controversia.

Como señala la Opinión, este Tribunal ha resuelto que los planteamientos constitucionales no deben abordarse cuando un caso **puede resolverse**: (1) **mediante un análisis estatutario válido**; (2) en armonía con los criterios de las partes y en consonancia con los mejores fines de la justicia; (3) al existir una **interpretación razonable de la legislación** que permita soslayar la cuestión constitucional, y (4) porque **la controversia puede quedar resuelta** definitivamente por otros fundamentos. A pesar de esto, la Opinión mayoritaria expresa más adelante que "esta doctrina se visualizó para evitar considerar los planteamientos de derechos constitucionales cuando sea posible **conceder el remedio solicitado** mediante una interpretación armoniosa de la ley".[1] Incluso, afirma que "cuando una causa de acción de un demandante con relación a una interpretación estatutaria no prevalece, pero este, a su vez ha levantado un planteamiento constitucional en la alternativa, los tribunales estamos obligados atenderlos".[2]

Estas aseveraciones parecerían reconfigurar los requisitos de la doctrina de autolimitación judicial de manera tal que esta resulta en una camisa de fuerza a la hora de considerar y adjudicar controversias en las que se presente un argumento constitucional. Entiéndase, el lenguaje propuesto tiene el efecto de obligar al Tribunal a atender planteamientos constitucionales siempre que no se pueda conceder el remedio solicitado por la vía estatutaria. En consecuencia, el Tribunal queda sin discreción para conceder remedios en los casos en que el

---

[1] (Negrilla suplida). Opinión, en la pág. 31.

[2] Íd.

estatuto no los provea y se plantee, en la alternativa, un argumento constitucional.

El Juez Asociado señor Estrella Martínez emitió la siguiente expresión disidente a la cual se unió la Jueza Presidenta Oronoz Rodríguez:

Contrario al dictamen mayoritario, soy del criterio de que las disposiciones del Código Electoral de Puerto Rico de 2020, Ley Núm. 58-2020, 16 LPRA sec. 4501 *et seq.*, aquí impugnadas por razones constitucionales, crean una clasificación sospechosa entre partidos políticos que recibieron el favor del electorado para fines de mantener su franquicia electoral. A mi juicio, dicha clasificación sospechosa afecta a la parte peticionaria, particularmente en lo que respecta a su representatividad ininterrumpida ante la Comisión Estatal de Elecciones (CEE).

Como resultado, lo anterior ha generado una desigualdad que se manifiesta máxime cuando todos los partidos políticos están igualmente situados por haber conservado su franquicia electoral tras los resultados de las Elecciones Generales del 2024. Esta clasificación tiene como resultado material excluir a Proyecto Dignidad de tener presencia y representación continua en la CEE. A su vez, contraviene garantías fundamentales como, por ejemplo, la igual protección de las leyes, pues no reconoce la igual participación ni los mismos derechos y prerrogativas en la administración de la CEE a todos los partidos políticos que gozaron de apoyo electoral suficiente para participar de manera equitativa en los procesos deliberativos y de toma de decisiones. Ello, sin duda, lacera los cimientos y principios más básicos de nuestro sistema de gobierno plenamente democrático y, simultáneamente, pone en entredicho las garantías de transparencia, fiscalización y contrapeso político que rigen nuestros procesos electorales.

El esquema organizacional dispar aquí impugnado, al solamente reconocer la participación plena en los procedimientos deliberativos y de gobierno en la CEE a exclusivamente un máximo de tres (3) partidos estatales principales, penaliza el ejercicio del derecho fundamental al voto y a la libre asociación de los electores del partido minoritario. Además, vulnera el axioma de igualdad electoral en todas sus dimensiones y concepciones, aún bajo las distintas visiones

mayoritarias y minoritarias de este Tribunal. Véase, *Rivera Segarra v. Rivera Lassen*, 2024 TSPR 60 (2024) (Op. disidente del Juez Asociado señor Estrella Martínez); *Com. CNP v. CEE*, 197 DPR 914, 971-976 (2017) (Op. disidente del Juez Asociado señor Estrella Martínez). Precisamente, este Tribunal ya había reconocido que serán susceptibles de impugnación constitucional "las actuaciones que hacen onerosa o afectan negativa y sustancialmente el potencial de los partidos contrarios minoritarios o nuevos, así como cuando se crean situaciones que los colocan en una posición de inferioridad". *Rivera Segarra v. Rivera Lassen*, *supra*, citando a *P.R.P. v. ELA*, 115 DPR 631, 638 (1984) (Op. disidente del Juez Asociado señor Estrella Martínez).

Más importante aún, considero que el Estado no logró superar el escrutinio constitucional estricto ni demostrar que despojar de su igual representación a un partido como Proyecto Dignidad, a pesar de que goza de una franquicia electoral, persigue un interés público apremiante y que no existen otros medios menos onerosos para hacerlo. Por el contrario, el presunto interés en procurar la eficiencia, el ahorro fiscal y la proporcionalidad es, a todas luces, un pretexto evidente para ocultar la intención discriminatoria contra los partidos de nueva creación, limitando así los espacios de pluralidad y, con ello, consolidando la hegemonía de los partidos mayoritarios en los procedimientos electorales. Después de todo, "[d]istinto a las alegaciones simplistas de algunos sectores, el sistema electoral no es un gasto, sino una inversión vital para garantizar la democracia en Puerto Rico". Exposición de Motivos, Código Electoral de Puerto Rico de 2020, *supra*.

Por todo ello, opino que las disposiciones del Código Electoral aquí en controversia crean una desigualdad indebida o una situación de inferioridad representativa no justificada de unos partidos políticos sobre otros que contraviene nuestro ordenamiento democrático, consagrado en la Constitución de Puerto Rico y en la Constitución de los Estados Unidos. Por todas estas razones, respetuosamente disiento.

El Juez Asociado señor Colón Pérez emitió una Opinión Disidente a la cual se unió la Jueza Presidenta Oronoz Rodríguez. El Juez Asociado señor Candelario López no interviene.


                              Javier O. Sepúlveda Rodríguez
                              Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Juan M. Frontera Suau y otros

    Peticionarios

        v.                  CC-2025-0094     *Certiorari*

Jessika Padilla Rivera y otros

    Recurridos

Opinión Disidente emitida por el Juez Asociado SEÑOR COLÓN PÉREZ a la cual se une la Jueza Presidenta ORONOZ RODRÍGUEZ.

En San Juan, Puerto Rico, a 16 de mayo de 2025.

En una sociedad que se hace llamar democrática, y que posee un órgano gubernamental, -- de naturaleza representativa --, encargado de procurar la pureza y transparencia en los comicios que aquí se celebran, todos aquellos partidos políticos que pasen el umbral de votos determinados por ley para mantener su franquicia electoral, deben participar, en igualdad de condiciones, en la toma de decisiones de dicho ente electoral. Así, claramente se desprende de una interpretación, desinteresada y desapasionada, de nuestra Carta Magna.

En ese sentido, cualquier clasificación malintencionada que sobre estos últimos se haga dentro

del altamente cuestionado Código Electoral de 2020, *infra*, y particularmente aquellas que busquen derrotar el antes mencionado **axioma de igualdad electoral**, al crear una carga injustificada sobre alguno de los partidos políticos que haya logrado su inscripción, -- como lo sería el perder su voz y su voto en el lugar donde se tomen las decisiones que pudiesen afectarle --, no supera el escrutinio aplicable en este tipo de escenarios, a saber, el escrutinio estricto. Lo que, a su vez, redunda en que dicha clasificación sea totalmente inconstitucional.

Proyecto Dignidad, -- a través del voto igual, directo, secreto y libre, emitido, de manera íntegra, por 46,686 puertorriqueños y puertorriqueñas en las elecciones generales de 2024 --, se ganó su espacio en nuestro entorno electoral, y con ello, un asiento con voz y voto en la Comisión Estatal de Elecciones de Puerto Rico.[1] Lamentablemente, hoy, -- con solo 5 votos --, se frustra el deseo de parte de nuestro Pueblo, y el referido asiento en el órgano gubernamental en cuestión se le arrebata a la mencionada fuerza política. He aquí otro capítulo más de las injusticias de la justicia.

I.

Los hechos que dan margen al presente litigio no están en controversia. En extrema síntesis, el pasado 5 de

---

[1] **Es menester señalar que, en este escrito, solo se hace mención al voto íntegro emitido a favor de Proyecto Dignidad, pues ese tipo de voto es el que hay que evaluar a los fines de disponer correctamente de los asuntos ante nuestra consideración.**

noviembre de 2024 se celebraron las elecciones generales en Puerto Rico. El partido político Proyecto Dignidad postuló candidatos bajo su insignia en la papeleta estatal, legislativa y municipal.

Finalizado el conteo de votos, ese mismo 5 de noviembre, se le informaron al País los resultados a los que se llegaron en la noche del evento electoral. Resultados que, posteriormente, tenían que ser validados en el escrutinio general.

Así las cosas, el 27 de diciembre de 2024 la Comisión Estatal de Elecciones (en adelante, "CEE"), -- a través de su entonces Presidenta Alterna, Hon. Jessika Padilla Rivera --, le remitió una carta al Comisionado Electoral de Proyecto Dignidad, Lcdo. Juan M. Frontera Suau (en adelante, "licenciado Frontera Suau"), en la cual le informó que, basado en los resultados del evento electoral que acababa de finalizar, se procedería con el cierre operacional de la oficina de éste en la CEE, efectivo el 13 de enero de 2025. Asimismo, le remitió cartas de destitución a varios empleados adscritos al referido partido que trabajaban en la oficina del licenciado Frontera Suau y/o en otras dependencias de la CEE.

En respuesta, el 28 de diciembre de 2024 el licenciado Frontera Suau le cursó una comunicación escrita a la CEE. Mediante dicha comunicación, el referido letrado le solicitó al mencionado órgano gubernamental que cesara y desistiera de poner en vigor las determinaciones notificadas el 27 de

diciembre de 2024. El licenciado Frontera Suau alegó que tal proceder constituía una crasa violación a la Ley Núm. 58-2020, también conocida como el Código Electoral de Puerto Rico de 2020 (en adelante, "Código Electoral de 2020"), *infra*, y a los derechos constitucionales de los electores de Proyecto Dignidad.

De igual forma, el 30 de diciembre de 2024 Proyecto Dignidad y el licenciado Frontera Suau (en adelante y en conjunto, "Proyecto Dignidad") presentaron ante el Tribunal de Primera Instancia una *Demanda jurada de sentencia declaratoria, interdicto preliminar y permanente, y solicitud de injunction preliminar* en contra de la CEE y otros.[2] En esencia, el mencionado partido político argumentó que el esquema de composición y gobierno del referido órgano gubernamental, según dispuesto en los Arts. 3.1(a)-(f) y 6.1 del Código Electoral de 2020, *infra*, era inconstitucional por crear clasificaciones inequitativas entre los distintos partidos políticos con representación en la CEE.[3]

En ese sentido, Proyecto Dignidad solicitó que se declarasen inconstitucionales tales disposiciones legales y, por consiguiente, se decretara ilegal el cierre operacional

---

[2] En particular, el Lcdo. Aníbal Vega Borges, Comisionado Electoral del PNP; la Lcda. Karla M. Angleró González, entonces Comisionada Electoral del PPD; la Lcda. Lilliam M. Aponte Dones, entonces Comisionada Electoral del Movimiento Victoria Ciudadana, el Sr. Roberto Iván Aponte, Comisionado Electoral del PIP, y contra el Estado Libre Asociado de Puerto Rico.

[3] Además del planteamiento constitucional, Proyecto Dignidad arguyó que el término de vigencia para los nombramientos de los Comisionados Electorales de los partidos políticos con franquicia electoral se extendía hasta el 30 de junio de 2025, por lo que no procedía, en ese momento, el cierre de su oficina en la CEE.

de su oficina en la CEE. A su vez, el mencionado partido político peticionó ser reconocido como miembro de la CEE en igualdad de condiciones con respecto a los demás partidos políticos que la componen.

Dicho ello, cabe destacar que, el 31 de diciembre de 2024, la CEE certificó los resultados oficiales del escrutinio general de las elecciones celebradas el 5 de noviembre de 2024. En lo pertinente, los resultados arrojaron que, **del total de votos íntegros en la papeleta estatal**, el Partido Nuevo Progresista (en adelante, "PNP") obtuvo el 54.44%, el Partido Popular Democrático (en adelante, "PPD") obtuvo el 32.24%, el Partido Independentista Puertorriqueño (en adelante, "PIP") obtuvo el 6.96% y el Proyecto Dignidad obtuvo el 6.24%.

Días más tarde, el 2 de enero de 2025 para ser específicos, el foro primario emitió una *Orden para mostrar causa* dirigida a que las partes demandadas expusieran su posición respecto a las alegaciones de Proyecto Dignidad. En respuesta, el 3 de enero de 2025 la CEE presentó ante el Tribunal de Primera Instancia una *Moción en cumplimiento de orden* en la cual planteó que sus actuaciones eran cónsonas con lo dispuesto en el Código Electoral de 2020, *infra*, y que dicha normativa no era discriminatoria, pues no impedía la participación de Proyecto Dignidad en las decisiones del mencionado órgano gubernamental.[4]

---

[4] De igual forma, el Estado Libre Asociado de Puerto Rico, el PNP y el PIP presentaron sus respectivos escritos.

Específicamente, la CEE argumentó que, de conformidad con lo establecido en el Artículo 3.1(2)(a) y (c) del Código Electoral de 2020, *infra*, la composición de dicho órgano gubernamental sería de al menos dos y hasta un máximo de tres *Comisionados Electorales Propietarios*.[5] Razonó que, ante el resultado de los comicios de noviembre de 2024, serían el PNP, el PPD y el PIP los partidos que contarían con *Comisionados Electorales Propietarios*, mientras que Proyecto Dignidad estaría representado por un *Comisionado Electoral Adicional*.[6]

Evaluados los argumentos de las partes, el 8 de enero de 2025 el foro primario emitió una *Sentencia* mediante la cual declaró ha lugar la *Demanda*. En particular, **y sin adentrarse en el cuestionamiento constitucional,**[7] el Tribunal de Primera Instancia determinó que la actuación de la CEE había sido prematura, toda vez que, conforme al Código Electoral de 2020, *infra*, la designación del licenciado

---

[5] Como estudiaremos más adelante, los *Comisionados Electorales Propietarios* representan, de ordinario, a aquellos *partidos estatales principales* con franquicia electoral luego de la elección general más reciente y que obtuvieron la mayor cantidad de votos íntegros bajo su insignia en la papeleta estatal. Art. 3.1 (2)(a), Código Electoral de 2020, 16 LPRA sec. 4511. Éstos serán miembros propietarios de la CEE con voz y voto. *Íd.*

[6] Por su lado, los *Comisionados Electorales Adicionales* serán los representantes de los nuevos partidos estatales, legislativos y municipales por petición que no sean elegibles para la membresía propietaria ante la CEE. Art. 3.1(2)(e), Código Electoral de 2020, 16 LPRA sec. 4511. Éstos solo serán convocados por el Presidente o la Presidenta de la CEE a las reuniones de Pleno cuando: (1) comience el ciclo electoral y (2) los temas a discutir, considerar o adjudicar se relacionen específicamente con los que correspondan a las categorías y las demarcaciones geoelectorales de sus respectivos partidos. *Íd.* Véase también, Art. 3.3(6), Código Electoral de 2020, 16 LPRA sec. 4513.

[7] El foro primario optó por aplicar la doctrina de autolimitación a los fines de resolver las controversias planteadas mediante un análisis estatutario y no constitucional.

Frontera Suau como Comisionado Electoral de Proyecto Dignidad expiraría diez (10) días después que se certificasen los resultados finales del escrutinio general.

Inconforme con el dictamen del foro primario, el 13 de enero de 2025 Proyecto Dignidad acudió al Tribunal de Apelaciones mediante una *Moción en auxilio de jurisdicción* y una *Apelación civil*. En resumen, el partido alegó, entre otras cosas, que el foro primario había errado al negarse a atender la controversia constitucional ante su consideración. Al respecto, reiteró la inconstitucionalidad del esquema de composición de la CEE dispuesto en el Código Electoral de 2020, *infra*, por éste limitar la participación plena y en igualdad de condiciones del referido partido político ante dicho órgano gubernamental.

Enterada de lo anterior, el 17 de enero de 2025 la CEE compareció ante el foro apelativo intermedio mediante un escrito titulado *Posición de la CEE a Apelación Civil presentada por la parte recurrente*. En éste, y en síntesis, el mencionado órgano gubernamental reiteró los planteamientos levantados ante el Tribunal de Primera Instancia.[8]

Examinados los alegatos de todas las partes con interés en este litigio, el 23 de enero de 2025 el Tribunal de Apelaciones dictó *Sentencia* mediante la cual confirmó la

---

[8] En esa misma fecha, el PNP también compareció ante el Tribunal de Apelaciones. En resumen, dicho partido sostuvo que el Tribunal de Primera Instancia había actuado correctamente y que las disposiciones del Código Electoral de 2020, *infra*, no vulneraban derechos constitucionales de forma irrazonable o arbitraria.

determinación del foro primario.[9] En esencia, el foro apelativo intermedio razonó que remitir la comunicación sobre el cierre de operaciones de la oficina del Comisionado Electoral de Proyecto Dignidad, -- antes de culminado el escrutinio general --, había sido una actuación prematura. **A su vez, entendió que no era necesario considerar la controversia de índole constitucional planteada por Proyecto Dignidad.**

En desacuerdo con el proceder del Tribunal de Apelaciones, y luego de denegada la correspondiente solicitud de reconsideración, el 14 de febrero de 2025 Proyecto Dignidad acudió ante nos mediante un *Recurso de certiorari*.[10] En síntesis, el partido sostiene que los Arts. 3.1(a)-(f) y 6.1 del Código Electoral de 2020, *infra*, aquí impugnados, lesionan el principio de la igualdad electoral, y los derechos al voto, a la libertad de asociación y a la igual protección de las leyes de sus votantes. A su vez, señala que la justificación dada por el Estado Libre Asociado de Puerto Rico para el trato desigual no supera el escrutinio

---

[9] Panel del Tribunal de Apelaciones integrado por su presidenta, la Jueza Cintrón Cintrón, la Jueza Rivera Marchand y la Juez Barresi Ramos.

Cabe destacar que la Jueza Rivera Marchand emitió un voto particular, concurrente en parte y disidente en parte. En esencia, la magistrada entendió que el foro apelativo intermedio venía llamado a atender el cuestionamiento sobre la validez constitucional del sistema de clasificación de partidos políticos propuesto por el Código Electoral de 2020, *infra*.

[10] Proyecto Dignidad también presentó ante nos una *Moción en auxilio de jurisdicción* y una *Solicitud de vista oral*. No obstante, ambas solicitudes fueron declaradas no ha lugar por una mayoría de esta Curia. La Jueza Presidenta Oronoz Rodríguez, el Juez Asociado señor Estrella Martínez y quien suscribe disentimos de ese proceder.

aplicable en este tipo de escenarios, a saber, el escrutinio estricto.

Expedido el *Recurso de certiorari*, el 18 de marzo de 2025 la CEE presentó su *Alegato de la Comisión Estatal de Elecciones a Recurso de certiorari*. En particular, el referido órgano gubernamental argumenta que el axioma de igualdad electoral no provee una garantía de que habrá igualdad en cuanto a resultados, sino que solo provee la oportunidad de competir en igualdad de condiciones. Así pues, arguye que Proyecto Dignidad no ha sufrido un trato desigual de esta naturaleza.

De igual forma, el Estado Libre Asociado de Puerto Rico, por conducto de la Oficina del Procurador General, compareció ante nos mediante un *Alegato.* En resumen, la referida dependencia gubernamental sostiene que no es necesario que este Tribunal se adentre en la constitucionalidad, o no, de los Arts. 3.1(a)-(f) y 6.1 del Código Electoral de 2020, *infra*, aquí impugnados. En la alternativa, alega que las disposiciones legales en cuestión son constitucionales, pues no son discriminatorias ni impiden la participación de Proyecto Dignidad en la CEE.

Por último, el 18 de marzo de 2025 tanto el PNP, como el PPD comparecieron ante nos. El PNP, en su *Alegato de la parte recurrida*, sostiene que el esquema de composición de la CEE dispuesto por el Código Electoral de 2020, *infra*, tiene la finalidad de reducir los gastos de dicho órgano gubernamental, según requerido por la Junta de Supervisión

Fiscal. A su vez, señala que la carga impuesta sobre Proyecto Dignidad es moderada, pues éste aún mantiene representación en asuntos relacionados a su partido.

El PPD, por su parte, en su *Alegato*, argumenta que los Arts. 3.1 y 6.1 del Código Electoral de 2020, *infra*, crean una desigualdad representativa y económica entre partidos políticos, lo cual afecta indebidamente los derechos al voto y a la libre asociación de los electores y las electoras de estas colectividades. Así las cosas, arguye que, al aplicar un escrutinio estricto, las referidas disposiciones no se sostienen, pues la CEE no ha logrado demostrar un interés apremiante que justifique tal actuación.

Trabada así la controversia, una mayoría de mis compañeras y compañeros de estrado, al correctamente adentrarse en el análisis constitucional de los asuntos ante nuestra consideración, incorrectamente sostiene la constitucionalidad de los Arts. 3.1(2)(a)-(f) y el 6.1 del Código Electoral de 2020, *infra*, y, con tal proceder, rechaza, nuevamente, la existencia del axioma de igualdad electoral que, a todas luces, está inmerso en la Constitución del Estado Libre Asociado de Puerto Rico. El resultado práctico de ello es la validación de un cuestionable esquema que excluye, de una participación eficaz y efectiva en la CEE, a la oposición o minoría.

**Tal como expresamos hace un tiempo atrás en *Rivera Segarra v. Rivera Lassen*, 213 DPR \_\_, 2024 TSPR 60 (Colón Pérez, opinión disidente), la determinación que hoy emite**

**una mayoría de este Tribunal se aparta de las nociones más básicas de la vida en democracia. Recordemos que, para el buen y normal funcionamiento de nuestro sistema político, en un País que se hace llamar democrático, es indispensable garantizar que los partidos minoritarios o de oposición tengan representación plena en aquellos espacios, -- como la CEE --, en los que se forja política pública. Al igual que, en su momento y en escenarios similares, lo hicieron la delegada y los delegados a la Convención Constituyente, en esta ocasión, -- desde la disidencia --, nos oponemos a permitir que los partidos políticos de mayoría posean control absoluto de los organismos gubernamentales de naturaleza electoral. Nos explicamos.**

II.

A.

Como es sabido, la Constitución del Estado Libre Asociado de Puerto Rico, -- al igual que la Constitución de los Estados Unidos --, consagra el derecho a la igual protección de las leyes. En particular, el Art. II, Sec. 7, de nuestra Constitución establece, en lo concerniente, que no "se negará a persona alguna en Puerto Rico la igual protección de las leyes". Art. II, Sec. 7, Const. E.L.A., LPRA, Tomo 1.[11]

---

[11] De igual forma, el Art. II, Sec. 1, del mismo documento señala que:

> La dignidad del ser humano es inviolable. **[Todas las personas] son iguales ante la Ley.** No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos

Según hemos sostenido en innumerables ocasiones, al amparo de este derecho de estirpe constitucional, el Estado no puede aprobar o poner en vigor ley o norma alguna que establezca un trato desigual para algunas personas, salvo que tenga una razón justificada para ello. *Rodríguez Pagán v. Depto. Servicios* Sociales, 132 DPR 617, 634 (1993); *Berberena v. Echegoyen*, 128 DPR 864, 878 (1991). Véase también, *Zachary International v. Tribunal Superior*, 104 DPR 267, 276-277 (1975). En ese sentido, la protección de la igual protección de las leyes no exige un trato igual para todos, sino que prohíbe el trato desigual injustificado. *López v. E.L.A.*, 165 DPR 280, 297 (2005); *P.A.C. v. E.L.A.*, 150 DPR 359, 378 (2000); *Defendini Collazo et al. v. E.L.A., Cotto*, 134 DPR 28, 60 (1993).

Conforme a ello, este Tribunal, en reiteradas instancias, ha sentenciado que el referido principio de igualdad, "[p]or su naturaleza dinámica[,] es susceptible de manifestarse en diversas dimensiones". *P.P.D. v. Gobernador I*, 139 DPR 643, 666-667 (1995); *P.R.P. v. E.L.A.*, 115 DPR 631, 633 (1984). En lo pertinente a la controversia ante nos, una de estas dimensiones es el axioma de igualdad electoral.

B.

El axioma de igualdad electoral tiene su génesis en el Art. IX, Sec. 6, de la Constitución del Estado Libre Asociado

---

principios de esencial igualdad humana. (Énfasis suplido). Art. II, Sec. 1, Const. E.L.A., LPRA, Tomo 1.

de Puerto Rico.[12] En cuanto a este axioma, y a pesar de que surge de un articulado de disposición transitoria, hemos establecido que comprende el postulado permanente de que **"en una sociedad democrática todos los electores y partidos políticos 'gozarán de iguales derechos'"**. (Énfasis suplido). *P.R.P. v. E.L.A.*, *supra*, pág. 637. Véase también, *P.P.D. v. Gobernador, supra*, pág. 679.

El axioma de igualdad electoral también tiene como base aquella disposición de la Carta de Derechos de nuestra Constitución que codifica y regula el derecho fundamental al voto. Art. II, Sec. 2, Const. ELA, LPRA, Tomo 1. *Comp. CNP v. CEE*, 197 DPR 914, 946-948, 885 (2017) (Oronoz Rodríguez, opinión disidente) (Colón Pérez, opinión disidente). El texto de la precitada cláusula constitucional, a grandes rasgos, sostiene que "las leyes garantizarán la expresión de la voluntad del [P]ueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral". Art. II, Sec. 2, Const. ELA, LPRA, Tomo 1.

**En términos generales, el axioma de igualdad electoral pretende impedir que un partido mayoritario: (1) limite el**

---

[12] En particular, este artículo establece lo siguiente:

> Los partidos políticos continuarán disfrutando de todos los derechos que les reconozca la ley electoral, siempre que reúnan los requisitos mínimos exigidos para la inscripción de nuevos partidos por la ley vigente al comenzar a regir esta Constitución. La Asamblea Legislativa, cinco años después de estar en vigor la Constitución, podrá cambiar estos requisitos, pero cualquier ley que aumente los mismos, no será efectiva hasta después de celebrada la elección general siguiente a la aprobación de la misma. Art. IX, Sec. 6, Const. E.L.A., LPRA, Tomo 1.

**nacimiento de otros partidos; (2) agrave la situación de los partidos de oposición existentes; o (3) introduzca cambios en las leyes y reglas electorales en beneficio de determinado partido o en perjuicio de los demás existentes o de aquellos que estén por inscribirse.** *P.R.P. v. E.L.A.*, *supra*, págs. 637-638. **En suma, este axioma tiene el propósito de prevenir que nuestro País se convierta en una sociedad unipartidista.** J. Farinacci Fernós, *Derecho Constitucional*, 87 Rev. Jur. UPR 324, 346 (2018).

Como se sabe, en múltiples ocasiones, este Tribunal ha tenido la oportunidad de extender el axioma de igualdad electoral a diferentes escenarios.[13] En ese ejercicio, y solo por mencionar algunos ejemplos, hemos pautado que este axioma exige igual acceso de los partidos políticos al fondo electoral gubernamental y que el axioma de igualdad electoral también prohíbe el uso de fondos públicos para beneficiar determinadas campañas políticas, en detrimento de otras. *Acevedo Vilá v. C.E.E.*, 172 DPR 971, 986 (2007); *Miranda v. C.E.E.*, 141 DPR 775 (1996); *P.P.D. v. Gobernador I*, *supra*; *Marrero v. Mun. de Morovis*, 115 DPR 643, 646 (1984); *P.S.P. v. Srio. de Hacienda*, 110 DPR 313 (1980) (Sentencia) (Negrón García, opinión concurrente).

**A su vez, y por ser en extremo pertinente para la correcta y completa disposición de los asuntos ante nuestra**

---

[13] Cabe destacar que, en *Com. P.N.P. v. C.E.E. et al.*, 197 DPR 914 (2017), una mayoría de este Tribunal determinó que el axioma de igualdad electoral, -- en su vertiente económica --, era inexistente en nuestro ordenamiento constitucional. Hoy, al igual que en esa y otras ocasiones, reafirmamos la existencia y relevancia de este principio.

**consideración, este Tribunal ha sentenciado que este axioma requiere igual participación de los partidos políticos en la CEE y en las Juntas de Inscripción Permanente.** *Com. CNP v. CEE*, *supra*, pág. 947 (Oronoz Rodríguez, opinión disidente); *P.R.P. v. E.L.A.*, *supra*, pág. 641; *P.S.P. v. Com. Estatal de Elecciones*, 110 DPR 400, 409-410 (1980). **Sobre esto último, hemos sostenido que las estructuras administrativas creadas en virtud de la legislación que regula el proceso eleccionario deben responder al axioma de igualdad electoral antes esbozado.** *P.R.P. v. E.L.A.*, *supra*, pág. 638. **Ello, pues la representación, incluso a ese nivel, garantiza la pureza electoral.** *Íd.*

C.

En el contexto de los partidos políticos, la relevancia del axioma de igualdad electoral radica, en primer lugar, en el valor de estas colectividades para el funcionamiento de la democracia moderna. Debemos tener presentes que los partidos políticos funcionan como vías para canalizar las distintas tendencias políticas e intereses de la sociedad. *McClintock v. Rivera Schatz*, 171 DPR 584, 597 (2007); *P.R.P. v. E.L.A.*, *supra*, pág. 638; *P.S.P. v. E.L.A.*, 107 DPR 590, 610 (1978). Indudablemente, son estas organizaciones las que "dirigen el debate sobre los asuntos públicos frente a las contiendas electorales, presentando sus respectivos programas de gobierno y nominando candidatos para ocupar los cargos públicos principales que ofrecen gobernar en

consonancia con esos programas". *P.N.P. v. De Castro Font II*, 172 DPR 883, 892 (2007).

Con ello en mente, en nuestra jurisdicción hemos reconocido el derecho que tienen las y los que aquí habitan a formar agrupaciones políticas y a proponer candidatos y/o candidatas para participar en los eventos electorales. *McClintock v. Rivera Schatz*, *supra*, pág. 597; *P.N.P. v. De Castro Font II*, *supra*, pág. 892; *P.A.C. v. E.L.A*, *supra*, pág. 372. Esto, como corolario de los derechos fundamentales al voto y a la libre asociación.[14] *Íd.*

**Ahora bien, más allá de formar agrupaciones políticas y/o proponer candidatos o candidatas para participar en los eventos electorales, la verdadera relevancia del axioma de igualdad electoral radica en el reconocimiento de la minoría o de la oposición como ingrediente fundamental de la democracia. Sobre este particular, vale recordar que, en sistemas políticos como el nuestro, los partidos de minoría o de oposición son considerados un elemento vital, pues éstos sirven importantísimas funciones, como lo son: (1) introducir nuevos asuntos y/o temas en la agenda política; (2) fiscalizar la labor del gobierno de turno; (3) informar y movilizar a los votantes, y (4) proveerle a estos últimos**

---

[14] El derecho a la libre asociación está consagrado en el Art. III, Sec. 6, de la Constitución del Estado Libre Asociado de Puerto Rico. Dicha sección lee: "Las personas podrán asociarse y organizarse libremente para cualquier fin lícito, salvo en organizaciones militares o cuasi militares". Art. III, Sec. 6, Const. ELA, LPRA, Tomo 1.

una alternativa distinta al momento de ejercer su voto.[15] **Puesto de otra forma, la existencia de la oposición o la minoría fomenta una mejor gobernanza. Esto último no solo ha sido reconocido por la literatura científica, sino que también por nuestra y nuestros delegados a la Convención Constituyente, y por este Tribunal.** Véase, Art. III, Sec. 7, Const. ELA, LPRA, Tomo 1; *McClintok v. Rivera Schatz*, *supra*, pág. 605; *P.N.P. v. De Castro Font* II, *supra*, pág. 893; *P.A.C. v. E.L.A.*, *supra*, pág. 372; *P.I.P. v. C.E.E.*, 120 DPR 580, 617 (1988).

D.

**Reconociendo, pues, la primacía del axioma de igualdad electoral en el contexto de las labores que realizan los partidos políticos minoritarios o de oposición, es que hemos establecido que "las actuaciones que hacen onerosa o afectan negativa y sustancialmente el potencial de [éstos], así como cuando se crean situaciones que les colocan en una posición de inferioridad" son susceptibles de impugnación constitucional.** (Énfasis suplido). *P.P.D. v. Gobernador I*, *supra*, pág. 667. *P.R.P. v. ELA*, *supra*, pág. 638. Nos corresponde precisar, entonces, cuál es la metodología analítica, -- o el escrutinio constitucional --, bajo la cual debe evaluarse una actuación del Estado que se alegue viole este principio.

---

[15] E. Bulmer, *Opposition and legislative minorities: Constitutional roles, rights and recognition*, International IDEA 9 (2021), https://www.idea.int/sites/default/files/publications/opposition-and-legislative-minorities-constitutional-roles-rights-recognition.pdf.

E.

Sobre este último extremo, es menester señalar que este Tribunal ha resuelto que, en aquellos escenarios donde se impugna una clasificación que afecta un derecho fundamental, -- **como lo es el derecho al voto y el derecho a la libre asociación** --, la referida actuación del Estado debe analizarse bajo un escrutinio estricto. *López v. E.L.A.*, 165 DPR 280, 295-296 (2005); *Pérez, Román v. Proc. Esp. Rel. de Fam,* 148 DPR 201, 212 (1999); *San Miguel Lorenzana v. E.L.A.*, 134 DPR 405, 425 (1993); *Rodríguez Rodríguez v. E.L.A.*, 130 DPR 562 (1992).

Dicha metodología, -- entiéndase, la del escrutinio estricto --, precisa del análisis más riguroso, mediante el cual se presume la inconstitucionalidad de la disposición de ley o reglamentaria impugnada. *Rodríguez Rodríguez v. E.L.A.*, *supra*, pág. 581; *Berberena v. Echegoyen*, *supra*, pág. 879; *Zachry International v. Tribunal Superior*, *supra*, pág. 277. Así pues, en esos escenarios, el Estado tiene el deber de demostrar que la clasificación responde a un interés estatal apremiante y que la misma es necesaria para promover ese interés; en otras palabras, debe probar que no existe un medio menos oneroso para adelantar o alcanzar tal interés. *San Miguel Lorenzana v. E.L.A.*, *supra*, págs. 425-426; *Calo Morales v. Cartagena Calo*, 129 DPR 102, 132-133 (1991); *Alicea v. Córdova*, 117 DPR 676, 688 (1986).

Ahora bien, sobre los asuntos aquí bajo estudio, es nuestra responsabilidad mencionar que, a pesar de que el

axioma de igualdad electoral representa un principio importante dentro de nuestro ordenamiento jurídico, éste, -- según este Tribunal ha señalado -- no constituye un valor constitucional de la más alta jerarquía "equiparable en rango a derechos fundamentales". *P.N.P. v. Carrasquillo*, 166 DPR 70, 79 (2005). Consecuentemente, la mera alegación de que una actuación del Estado viola el principio de igualdad electoral no acarrea automáticamente un análisis bajo el escrutinio estricto.

En ese sentido, en controversias como las que hoy nos ocupan, será necesario, -- además de estudiar todo lo relacionado al axioma de igualdad electoral --, evaluar los hechos particulares del caso y los derechos fundamentales, si alguno, afectados por la clasificación establecida. Pasemos, pues, a esta tarea.

III.

A.

De entrada, al adentrarnos en la mencionada tarea, debemos tener presente que la Constitución del Estado Libre Asociado de Puerto Rico establece que la Asamblea Legislativa es el ente llamado a regular "todo lo concerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidaturas". Art. VI, Sec. 4, Const. ELA, LPRA, Tomo 1. Ahora bien, y según hemos reiterado en el pasado, son los tribunales los que tienen el deber de asegurar que la legislación promulgada a esos fines cumpla con las garantías constitucionales establecidas en nuestra

Carta Magna. *Rivera Segarra v. Rivera Lassen*, *supra* (Colón Pérez, opinión disidente); *Aponte Rosario v. Pres. CEE II*, 205 DPR 400, 475-476 (2020) (Colón Pérez, opinión disidente); *Sánchez y Colón v. ELA II*, 134 DPR 503, 530 (1993) (Hernández Denton, opinión de conformidad); *P.P.D. v. Admor. Gen. De Elecciones*, 111 DPR 199, 221 (1981).

B.

Dicho ello, en la actualidad, la normativa que regula todo lo relacionado a los procesos electorales que se celebran en nuestro País se encuentra codificada en el Código Electoral de 2020, 16 LPRA sec. 4501 *et seq*. Sobre ésta, antes de elaborar en lo relacionado al funcionamiento y composición de la CEE, -- asunto principal ante nuestra consideración --, exploraremos el significado de algunos conceptos de particular importancia para la correcta disposición de los asuntos aquí bajo análisis.

En esa dirección, debemos comenzar por mencionar que el Art. 6.1 del Código Electoral de 2020, *infra*, define y establece varias categorías de partidos políticos. 16 LPRA sec. 4591. Así, por ejemplo, el concepto de *partido estatal*, se define de la siguiente manera:

> Partido Político con **franquicia electoral**[16] que, **en la más reciente Elección General**, participó y cumplió con los siguientes requisitos:

---

[16] El Código Electoral de 2020, *supra*, define el término de *franquicia electoral* como la concesión de derechos y prerrogativas que el referido estatuto y la CEE le reconocen a un partido político por haber demostrado su apoyo electoral en la más reciente elección general dentro de las cantidades mínimas de votos obtenidos y según sus respectivas categorías como candidatos políticos. Art. 2.3(42), Código Electoral de 2020, 16 LPRA sec. 4503.

      i.    **Como mínimo, postuló bajo su insignia las siguientes candidaturas:**

(A)    **Papeleta Estatal:** un candidato a Gobernador de Puerto Rico y un candidato a Comisionado Residente de Puerto Rico en Washington D.C.

(B)    **Papeleta Legislativa:** un candidato a senador por acumulación; un candidato a representante por acumulación.

(C)    **Papeleta Municipal:** un candidato a alcalde con las candidaturas agrupadas de sus Legisladores Municipales, en por lo menos el cincuenta por ciento (50%) de los municipios de Puerto Rico.

      ii.    **Obtuvo más del dos por ciento (2%), pero menos del veinticinco por ciento (25%) de los votos íntegros bajo su insignia en la Papeleta Estatal del total de votos válidos emitidos en esa papeleta.** (Énfasis suplido). Art. 6.1(1)(a), Código Electoral de 2020, 16 LPRA sec. 4591.

Del precitado texto legal podemos colegir que todo *partido estatal* tiene que cumplir con tres características principales: (1) tener franquicia electoral; (2) haber participado de las más recientes elecciones generales y postulado, bajo su insignia, candidatos o candidatas a la papeleta estatal, legislativa y municipal; y (3) haber obtenido más del 2%, pero menos del 25%, de los **votos íntegros** bajo su insignia en la papeleta estatal. Ahora bien, dependiendo de la cantidad de votos íntegros obtenidos, al *partido estatal* se le podrá subclasificar como *partido estatal principal*. *Íd.*, inciso (1)(d).

En esa línea, el Código Electoral de 2020, *supra*, establece que un *partido estatal principal* es aquel *partido estatal* con franquicia electoral que, en la más reciente

elección general, obtuvo más del 25% de votos íntegros bajo su insignia en la papeleta estatal, del total de votos válidos emitidos en esa papeleta.[17] *Íd.*

Por último, y en un contexto un poco distinto, el referido estatuto también define el concepto de *partido estatal por petición*. Este último se refiere a una agrupación de ciudadanos o ciudadanas que, antes de la próxima elección general, solicita y cumple con los requisitos de inscripción y certificación establecidos. *Íd.*, inciso (1)(b). En otras palabras, un *partido estatal por petición* no cuenta con franquicia electoral pues: (1) participa por primera vez de unas elecciones generales o (2) en las últimas elecciones generales no alcanzó la cantidad de votos mínima para retener su franquicia electoral.[18]

**Como estudiaremos a continuación, el apoyo obtenido por un partido político, -- y, su subsecuente clasificación como *partido estatal*, *partido estatal principal* y/o *partido estatal por petición* --, será determinante para establecer la participación de dicha colectividad en la CEE.**

---

[17] A su vez, un partido estatal principal también puede ser subclasificado como un *partido estatal de mayoría*. El referido estatuto define el concepto de *partido estatal de mayoría* como aquel *partido estatal principal* con franquicia electoral que, en la más reciente elección general, obtuvo la mayor cantidad de votos íntegros bajo su insignia en la papeleta estatal, del total de votos válidos emitidos en dicha papeleta. Art. 6.1(1)(c), Código Electoral de 2020, 16 LPRA sec. 4591.

[18] Sobre esto último, el Código Electoral de 2020, *supra*, dispone que luego de la elección general para la cual el *partido estatal por petición* solicitó su certificación, solamente retendrá su franquicia electoral como *partido estatal* aquel que haya obtenido más de 2% de votos íntegros del total de votos válidos adjudicados en la papeleta Estatal. Art. 6.1(1)(b)(viii), Código Electoral de 2020, 16 LPRA sec. 4591.

C.

Al respecto, conviene señalar aquí que es el Capítulo III del Código Electoral de 2020, *supra*, el que regula todo lo concerniente a las funciones y la composición de la CEE. Conforme al mismo, se crea el referido órgano gubernamental como un ente colegiado, deliberativo y adjudicativo. Art. 3.1 (2)(a), Código Electoral de 2020, 16 LPRA sec. 4511.

A grandes rasgos, la CEE tiene como misión garantizar que los servicios, procesos y eventos electorales se planifiquen, organicen y realicen, entre otras cosas, con pureza y transparencia. *Íd.,* inciso (1). Además, el referido órgano gubernamental viene llamado a asegurar que dichos trámites se efectúen libre de fraudes y coacción, y sin inclinación a ningún grupo o sector, ni tendencia ideológica o partidista alguna. *Íd.*

En cuanto a su composición, y en lo pertinente, el Código Electoral de 2020, *supra*, identifica la figura del Comisionado Electoral como parte integral de la CEE. El concepto de Comisionado Electoral es definido como aquella persona designada por el presidente o la presidenta de un partido político para que represente a este último ante la CEE. Art. 2.3(28), Código Electoral de 2020, 16 LPRA sec. 4503. Según el estatuto bajo estudio, existirán dos tipos de Comisionados Electorales: (1) los *Comisionados Electorales*

*Propietarios*;    y    (2)    los    *Comisionados    Electorales   Adicionales*.[19]

D.

Sobre los *Comisionados Electorales Propietarios*, el Código Electoral de 2020, *supra*, comienza por establecer que se contará con un mínimo de dos y hasta un máximo de tres. Art. 3.1 (2)(a), Código Electoral de 2020, 16 LPRA sec. 4511. Éstos representarán, de ordinario, a aquellos *partidos estatales principales* con franquicia electoral luego de la elección general más reciente y que hayan obtenido la mayor cantidad de votos íntegros bajo su insignia en la papeleta estatal. *Íd*.

**Ahora bien, el inciso (c) del referido artículo dispone cómo se designarán los *Comisionados Electorales Propietarios* cuando, -- luego de la certificación final de los resultados de una elección general --, haya menos de tres *partidos estatales principales* con franquicia electoral.** *Íd*., inciso (c). **En tales instancias, para completar el máximo de tres *Comisionados Electorales Propietarios* se incluirá al *partido estatal* con franquicia electoral que obtuvo en la elección general más reciente la segunda y hasta la tercera cantidad**

---

[19] Cabe destacar aquí que, el Código Electoral de 2020, *supra*, también hace referencia a una tercera categoría de Comisionados Electorales: los *Comisionados Electorales Alternos*. Los *Comisionados Electorales Alternos* son las personas que **sustituyen** al Comisionado Electoral, -- ya sea este Propietario o Adicional --, con todas sus facultades, deberes y prerrogativas. Art. 2.3(27), Código Electoral de 2020, 16 LPRA sec. 4503. En específico, éstos "ejercerán las funciones de los Comisionados Electorales en caso de ausencia, incapacidad, renuncia, muerte, destitución, o cuando por cualquier causa quedara vacante el cargo o hasta que el Comisionado Electoral en cuestión se reintegre a sus funciones o se haga una nueva designación". Art. 3.10, Código Electoral de 2020, 16 LPRA sec. 4520.

de votos íntegros bajo su insignia en la papeleta estatal.[20]
*Íd*. **El porqué de esta sospechosa limitación no ésta del todo claro en la ley, ni en su historial legislativo.**

Por otra parte, el Código Electoral de 2020, *supra*, también crea la figura de los *Comisionados Electorales Adicionales*. Específicamente, se dispone que así se le designará a los Comisionados Electorales de "los nuevos Partidos Estatales, Legislativos y Municipales por Petición que no sean elegibles para la membresía propietaria ante la [CEE]". (Énfasis suplido). *Íd*., inciso (e). **El porqué de esta sospechosa clasificación tampoco está del todo claro en la ley, ni en su historial legislativo**.

Como adelantamos, la clasificación de un *Comisionado Electoral como Propietario o Adicional* determinará sus derechos y prerrogativas, -- y, por consiguiente, los derechos y prerrogativas del partido político al que representa --, ante la CEE. Veamos las diferencias.

E.

En lo relacionado a las diferencias en los puestos antes señalados, el Código Electoral de 2020, *supra*, dispone que los *Comisionados Electorales Propietarios* serán miembros propietarios de la CEE con voz y voto. Art. 3.1(2), Código Electoral de 2020, 16 LPRA sec. 4511. De hecho, se establece

---

[20] Asimismo, se dispone que cuando luego de la referida certificación final de los resultados haya menos de tres *partidos estatales principales* y *partidos estatales* con franquicia electoral elegibles para aumentar la composición de la CEE, prevalecerá la composición mínima de dos *Comisionados Electorales Propietarios* con los dos *partidos estatales* elegibles. Art. 3.1 (2)(d), Código Electoral de 2020, 16 LPRA sec. 4511.

de forma expresa que las decisiones de la CEE relacionadas con asuntos de naturaleza electoral se tomarán con la unanimidad de los *Comisionados Electorales Propietarios* presentes, -- en la reunión correspondiente --, que la componen. Art. 3.4(1), Código Electoral de 2020, 16 LPRA sec. 4514.

A su vez, los *Comisionados Electorales Propietarios* compartirán con el Presidente o la Presidenta de la CEE la responsabilidad de dirigir y supervisar los trabajos de naturaleza electoral para garantizar el máximo cumplimiento de la política pública y la misión de este organismo. Art. 3.10, Código Electoral de 2020, 16 LPRA sec. 4520. Éstos o éstas también podrán hacer recomendaciones administrativas al Presidente o a la Presidenta, o requerirle información sobre las operaciones de las oficinas administrativas de la CEE. *Íd.*

Asimismo, los *Comisionados Electorales Propietarios* devengarán una remuneración anual y cualquier diferencial asignado por ley equivalente al salario de un juez del Tribunal de Apelaciones de Puerto Rico, a saber, $139,563.00. Art. 3.10(4), Código Electoral de 2020, 16 LPRA sec. 4520. De igual forma, éstos o éstas contarán con una oficina en las instalaciones de la CEE y el personal correspondiente, y podrán solicitar al Presidente o a la Presidenta de la CEE que designe una partida de presupuesto para contratar asesores electorales. *Íd.*, incisos (9)-(10).

De otra parte, y a diferencia de los derechos de los *Comisionados Electorales Propietarios*, los derechos de los *Comisionados Electorales Adicionales* son, en extremo, limitados. En cuanto a su participación en el órgano gubernamental de naturaleza representativa, el Código Electoral de 2020, *supra*, establece que los *Comisionados Electorales Adicionales* serán convocados por el Presidente o la Presidenta de la CEE a las reuniones de Pleno cuando: (1) comience el ciclo electoral[21] y (2) los temas a discutir, considerar o adjudicar se relacionen específicamente con los que correspondan a las categorías y las demarcaciones geoelectorales[22] de sus respectivos partidos. Arts. 3.1(2)(e) y 3.3(6), Código Electoral de 2020, 16 LPRA secs. 4511, 4513. A su vez, se dispone expresamente que los votos de éstos o éstas solo serán permisibles en dichos asuntos. *Íd.*

A tenor con lo anterior, los *Comisionados Electorales Adicionales* no tienen derecho a devengar un salario como tal, ni a tener una oficina en la CEE. Más bien, la ley dispone que los servicios de éstos o éstas serán remunerados, según la dieta que les establezca la CEE, por la asistencia a cada

---

[21] Conforme al Código Electoral de 2020, *supra*, para una elección general, dicho ciclo comienza desde el 1ro de junio del año anterior al de la elección y culmina hasta treinta (30) días después de emitirse por la CEE la *Certificación final* del escrutinio general o recuento. Art. 2.3(20)(a), Código Electoral de 2020, 16 LPRA sec. 4503.

[22] El concepto de geoelectoral se refiere a "la aplicación de demarcaciones geográficas al contexto electoral de Puerto Rico. En el caso de la planificación electoral, se refiere a las demarcaciones geográficas que componen unidades electorales, precintos y municipios. En el caso de las Candidaturas a cargos públicos electivos, se refiere a alcaldías, distritos senatoriales y representativos". Art. 2.3(45), Código Electoral de 2020, 16 LPRA sec. 4503.

reunión del Pleno y cada reunión en la que se les convoque por los organismos de dicho órgano gubernamental. Art. 3.1(2)(e), Código Electoral de 2020, 16 LPRA sec. 4511.

Es, pues, a la luz de la normativa antes expuesta que, -- desde la disidencia --, procedemos a disponer del caso que nos ocupa.

IV.

Como mencionamos anteriormente, en el presente caso, Proyecto Dignidad sostiene que el esquema de composición y gobierno de la CEE, según codificado en los Arts. 3.1(a)-(f) y 6.1 del Código Electoral de 2020, *supra*, es inconstitucional por clasificar de manera inequitativa a los partidos minoritarios. En particular, argumenta que tal esquema de composición y gobierno de la CEE violenta el principio de igualdad electoral, y los derechos al sufragio, a la libre asociación y a la igual protección de las leyes, sin existir un interés apremiante que justifique dicho proceder. A todas luces, le asiste la razón.

Y es que, a la luz de la normativa antes expuesta, no albergamos duda alguna de que el actual esquema de composición y gobierno de la CEE, **-- en el cual ni en la ley, ni en su historial legislativo, queda claro el porqué de las limitaciones y clasificaciones que, en lo relacionado a la figura de los Comisionados Electorales, se incluyen en el mismo --,** constituye una violación crasa al axioma de igualdad electoral. Nos encontramos, precisamente, ante una de las instancias que dicho axioma busca prevenir,

entiéndase, aquellos cambios en la legislación electoral que beneficien a determinado partido y perjudican a otros.

Pero aún más importante, y como si lo anterior no fuese suficiente, el esquema de composición y gobierno establecido en la CEE incide sobre los derechos fundamentales al voto y a la libre asociación de las personas afiliadas a Proyecto Dignidad. Esto es así puesto que éste lesiona el derecho de representación de esta colectividad, -- la cual recibió suficiente apoyo en las últimas elecciones generales para ser denominada un *partido estatal* con franquicia electoral --, en el organismo gubernamental que regula todos los procesos eleccionarios en nuestro País, a saber, la CEE.[23]

Como resultado del cuestionado esquema de composición y gobierno de la CEE, **-- el cual el Estado no logró demostrar que superaba un análisis bajo el escrutinio estricto --,**[24]

---

[23] Según estudiamos, el Código Electoral de 2020, *supra*, -- no empece a establecer las limitaciones y clasificaciones aquí mencionadas --, no precisa la representación que tendrán los partidos políticos que, como Proyecto Dignidad, caen bajo la categoría de *partido estatal*, pero que no quedaron dentro de las tres primeras posiciones de la contienda electoral. La Opinión mayoritaria, al igual que la CEE y el Estado Libre Asociado de Puerto Rico, sostienen que partidos en la misma posición que Proyecto Dignidad tendrán derecho a un *Comisionado Electoral Adicional*.

En otras palabras, una mayoría de mis compañeras y compañeros de estrado equiparan el derecho de representatividad ante la CEE de un *partido estatal* que retuvo su franquicia electoral pero no alcanzó una de las primeras tres posiciones en las elecciones generales, con el de un *partido estatal por petición*. Dicha interpretación, aunque puede constituir un remedio para la falta de representación en instancias como la de autos, no subsana el hecho de que las clasificaciones establecidas laceran principios y derechos constitucionales básicos.

[24] En particular, y para considerarse válidas, las disposiciones impugnadas, que incidían sobre los derechos fundamentales al voto y a la libre asociación, debían superar un análisis bajo el escrutinio estricto. Es decir, el Estado venía llamado a demostrar la existencia de un interés estatal apremiante y que no existía un medio menos oneroso para adelantar o alcanzar el referido interés. Ello no ocurrió aquí.

En específico, el interés alegado por el Estado Libre Asociado de Puerto Rico fue optimizar la estructura de la CEE para garantizar,

las preocupaciones de los votantes de Proyecto Dignidad, en cuanto a materia electoral, no necesariamente serán consideradas. De igual forma, sus capacidades y herramientas de fiscalización se verán en extremo reducidas. Todo esto con el efecto de debilitar dicha fuerza política que, a pesar de constituir una minoría, en los últimos años se ha ganado un espacio en el sistema político de Puerto Rico.

**Ciertamente, reconocemos que la Asamblea Legislativa tiene la facultad de regular los pormenores de los eventos electorales que se celebran en nuestro País. Lo anterior incluye, claro está, el establecer los parámetros o requisitos mínimos para que una colectividad sea considerada un partido político en propiedad y, por consiguiente, tenga determinadas prerrogativas.**

**Ahora bien, en ese ejercicio, enfatizamos, dicho poder constitucional de gobierno no puede pasar por alto los principios que cimientan la Constitución del Estado Libre Asociado de Puerto Rico, a los que aquí hoy hemos hecho referencia. Como tampoco puede pasar por alto el reconocimiento de la minoría y/o la oposición como componente principal del sistema democrático que constantemente presumimos tener.**

En ese sentido, los Arts. 3.1(a)-(f) y 6.1 del Código Electoral de 2020, *supra*, según redactados, al igual que

---

esencialmente, su sostenibilidad económica. Aunque éste puede considerarse un interés de primera jerarquía, ni el Estado, ni la CEE, pudieron demostrar que el esquema instituido era el medio menos oneroso para adelantar dicho fin.

otras disposiciones contenidas en el mismo que hemos evaluado en el pasado, chocan de frente con tan nobles postulados. Procedía, pues, declarar su inconstitucionalidad. El error señalado fue cometido.[25]

V.

Por ese no ser ese el camino que siguió una mayoría de mis compañeras y compañeros en el presente caso, respetuosamente disentimos.

Ángel Colón Pérez<br>Juez Asociado

---

[25] Por considerar que el esquema de composición y gobierno de la CEE es inconstitucional, no es necesario adentrarnos en el otro error señalado por Proyecto Dignidad referente al momento en que procedería el cierre de operaciones de las oficinas de los Comisionados Electorales.